This litigation grows out of a written contract entered into on March 13, 1940, under which the plaintiffs, William S. Coci and Emanuel D'Antoni, agreed to buy, and defendant, Johness, Inc., agreed to sell, five lots of ground in what is known as the Bridgedale Subdivision in the Parish of Jefferson.
Plaintiffs allege that the defendant corporation breached the contract and failed, though put in default, to deliver the property in accordance with the contract, and they pray for judgment condemning the defendant to pay over to them double the amount of the deposit which was made when the agreement was entered into. They also pray for a reasonable attorney's fee, which is provided for in the contract in the event that either party should find it necessary to employ an attorney to enforce compliance.
Defendant corporation, admitting that the agreement was entered into, denies that it was in default, and avers that the plaintiffs themselves failed to take title to the property and should be held to have forfeited the deposit which was made when the contract was signed.
From a judgment in favor of plaintiffs for $1120, which is double the amount of the deposit, and for an attorney's fee of $200, defendant, Johness, Inc., has appealed.
The facts are more or less complex. On March 13, 1940, the written contract was entered into. Under it, Coci and D'Antoni agreed to buy, and Johness, Inc., agreed to sell, for $5600, "property located in Jefferson Parish, State of Louisiana, east bank of Mississippi River, situated in Section 'B', Square 51, Bridgedale Subdivision; same being all of lots 2, 3 and lots 1, 19, 20 except that part of said lots 1, 19, 20 which were sold to the Louisiana Highway Commission by Johness Investments, Inc., on Oct. 14, 1937, by act passed before Wm. J. Guste, N.P., in C.O.B. 138, folio 233, in records of Jefferson Parish or as per title, * * *."
With the exception of the words "or as per title," which are printed in the form, all of the other words of the description are typewritten.
The contract provided that the act of sale would be passed on or prior to April 10, 1940, before Sidney C. Schoenberger, notary public. Schoenberger is not only the notary named in the agreement, but he is the attorney for plaintiffs in this suit. It was also stipulated that a deposit of $560 would be made and that in the event that the vendees should fail to comply with the agreement, the vendor should have the right either to declare the deposit forfeited or to demand specific performance, and that in the event the vendor should not comply with the agreement, then the vendees should have the right to demand the return of double the deposit, or to insist upon specific performance.
In addition to the conditions and stipulations appearing on the printed and signed side of the contract, it was provided that other terms and conditions appeared "on reverse hereof." Among the terms and conditions which appear on the face or on the reverse, we note the following; that the unpaid balance would be secured by vendor's lien and mortgage and would be paid in monthly installments of $100 each; that as additional security, Johness, Inc., would be given a collateral note in the sum of $1,000, secured by first mortgage on certain other designated property and that the said note would be payable in one year with six per cent interest. It was provided that should this collateral note be paid on or before its maturity, "proceeds thereof shall be applied to the last maturing installments of said balance."
It was also stipulated that should the vendees, Coci and D'Antoni, decide within six months to borrow from a building and *Page 825 
loan association a sum not to exceed $5,000 for the purpose of erecting a building on the property and doing certain landscaping, Johness, Inc., would agree to subordinate its mortgage to such mortgage as might be executed in favor of the building and loan association, and that in that event the monthly installments would be reduced by such monthly sum as it might be necessary for Coci and D'Antoni to pay to the building and loan association.
There is an additional stipulation relative to acceleration of payments of the monthly installments required on the main obligation. This provision reads as follows:
"It is also understood that we shall have the right to make additional payments in excess of the monthly installment of $100.00 provided herein, such additional payments are to be applied to the last maturing installments. In other words, these payments are to be applied in inverse order."
The final stipulation provides that title to all of the property, both that to be purchased by plaintiffs and that to be collaterally mortgaged to secure the balance, would be "subject to approval of the Lawyers' Title Guaranty Company" at the expense of Coci and D'Antoni.
It is very clear that although the agreement provides that the act of sale would be executed on or before April 10, 1940, neither the vendor nor the vendees really made any effort to carry out this provision of the contract. We say this because, although counsel for the vendees maintains that the record shows that the vendor was notified that the vendees would be ready to take title on the date specified, April 10, 1940, there is no dispute over the fact that the vendees did not even request the title company to examine the title until April 15, 1940, which was five days after the last day fixed in the contract for transfer of title. So much for any effort of the vendees to take title within the time specified.
As to the vendor, there is no contention that any effort was made to force the vendees to accept title within the time limit set in the contract. We, therefore, disregard entirely the assertion that on that day, April 10, 1940, the vendees were ready, willing and able to accept title and that, therefore, the vendor on that day was in default and should be considered as having defaulted on the contract. We mention at this time an interesting fact which, however, we consider of no importance in view of the ultimate conclusions to which we have come and that fact is, that on July 13, 1940, the lots which were to be collaterally mortgaged as additional security up to the sum of $1,000 were sold by one of the vendees who was the real though not the record owner of such lots and that, therefore, after that time it was no longer possible for those lots to be mortgaged as collateral security for the principal obligation.
When the Title Company completed its examination, it reported on April 24, 1940, that "the depths of lots 1 and 2 do not check with the plan." This is conceded to mean that those two lots contained a depth of 35 feet less than they should have contained according to the plans which all parties had in mind when the sale was made. When this came to light, there was apparently a discussion as to what should be done, and the attorney for the vendees agreed that he would undertake the necessary curative work and bring the necessary proceedings to obtain a judgment correcting the description of those two lots so as to have them include this additional 35 feet of depth and that he would make no charge for his services if the vendor would pay the court costs of that proceeding. This offer was accepted and the vendor paid the costs shortly after July 13, 1940, which was the day on which counsel for vendees advised the vendor as to what those costs had been.
However, when the 35 foot strip which formed the rear portion of those two lots was included in the title and the necessary certificates were obtained, it then appeared that against that strip there was recorded a mortgage in favor of the Reconstruction Finance Corporation, and of course, the vendees were still unwilling to accept title until that encumbrance could be erased from the records. Accordingly, it was agreed between counsel that if counsel for the vendees would prepare the release which he desired the Reconstruction Finance Corporation to execute, counsel for vendor would undertake to have the release *Page 826 
executed and to have the recordation of the encumbrance erased. On July 24, 1940, counsel for the vendees wrote a letter to Johness, Inc., the vendor, in which he enclosed "a draft of release" which he desired Johness, Inc., to obtain from the Reconstruction Finance Corporation. In that letter he stated that he understood that "this whole matter will have to be forwarded to Washington for approval, then returned to New Orleans and be signed by an agent for the corporation." Five days after writing that letter, counsel for the vendees, plaintiffs in this litigation, wrote another letter dated July 29, 1940, to Johness, Inc., and in that letter sought to put Johness, Inc., in default and demanded that Johness, Inc., pay over to the vendees, double the amount of the deposit. We do not find that letter nor a copy thereof in the record, but counsel agree as to its date and contents.
Nothing was done as a result of that letter for, as a matter of fact, the necessary release from Reconstruction Finance Corporation was not obtained until nearly eight months later. When the release was obtained from Reconstruction Finance Corporation in March, 1941, counsel for the vendor, Johness, Inc., on March 27, 1941, addressed a letter to the attorney for the vendees stating that the release had been obtained, that the title was now cleared, and that unless the vendees "signify their willingness to take title to the property within three days from the date of this letter, we should be constrained to consider them in default and accordingly the deposit made on account of the purchase price concurrently with the execution of the agreement of purchase, will be forfeited." This suit followed, though it was not filed until June 6, 1942.
As we have already stated, it is very evident that the vendor was not put in default on April 10, 1940, for on that day the vendees were entirely unwilling to accept title and, in truth, several days later entered into a verbal agreement for the purpose of curing defects in the title. Surely their action in making this agreement prevents their now contending that there was a default on April 10th as a result of which they are entitled to the return of double the amount of the deposit. Nor can they point to the letter of July 29, 1940, as having had the effect of putting the vendor in default, because only five days before they had agreed to wait until the necessary release could be obtained from the Reconstruction Finance Corporation, and had shown that they realized that the matter must be subjected to the delays which always occur where governmental red tape is involved, for they had said that they knew that it must be forwarded to Washington and then returned to New Orleans. They cannot be heard to contend that only five days after they had asked that the release be sent to Washington for execution they were justified in changing their position and in contending that they could, on that day, July 29, 1940, put the vendor in default, and that as a result they may now demand that they be paid double the amount of their deposit.
We do not find it necessary to determine whether or not the vendees could have been required to wait indefinitely for the clearing of the title. When it was found that the title was defective, first because the description was obviously faulty, possibly they could then have rejected the title and put the vendor in default. They did not do so. After the correction in description had been made and it was found that a mortgage bore against part of the property, it may be that they could have refused to accept the title and possibly they could then, by putting the vendor in default, have claimed double the amount of the deposit. But again they did not choose to do this and instead agreed that the additional curative work which was necessary would be undertaken. They could not then immediately change their attitude and claim a default until after the lapse of a reasonable time. But thereafter they made no effort to put the vendor in default and cannot now be heard to claim that there was a default on April 10, 1940, or that there was default on July 29, 1940.
While no authorities on this point have been submitted and probably none are necessary, we find that in several cases it has been held that where, after the *Page 827 
expiration of the time limit set in a contract to sell real estate, the parties have voluntarily agreed expressly or by implication that the time limit will be extended in order that title curative work may be done, or for some other reason, or where it is obvious that such a delay has been acquiesced in, no longer may there be claimed a default based on the failure to take title within the time limit originally fixed.
In Lamar v. Young, 211 La. 837, 30 So.2d 853, the Supreme Court considered such a situation. There, after the expiration of the time set in the contract for the taking of title, there were conversations between the parties and their respective brokers concerning the necessity for obtaining a survey and also concerning title to the property. The Court held that these conversations indicated that the parties did not intend to rely upon the original time limit set in the contract.
In Johnson v. Shreveport Properties, Inc., et al.,213 La. 485, 35 So.2d 25, 26, the Supreme Court held that where parties indicate, by their actions, that a time limit set in a contract is not to be insisted upon there is a waiver of the right to demand compliance within that time limit. The court said:
"If time were of the essence of the contract under consideration the argument thus made might be effective. But the pleadings, which are being assailed, together with the annexed documents, do not show that to be true. In fact, incidentally, on the trial of the case it was clearly and definitely disclosed that the fifteen day period stipulated for the consummation of the sale was of no importance and further that it had been waived by the parties."
In Bonfield v. Tichenor, La. App., 189 So. 635, 637, we quoted from Abeles Co. v. Robinson-Slagle Lumber Co., 6 La. App. 447, as follows:
"If the promissory has made default in performance, with respect to the time thereof, and the promisee subsequently permits or urges him to continue performance, or accepts performance thereafter, or accepts payments made in performance, or otherwise treats such contract as still in force, such breach is waived."
See, also, Dewenter v. Mott, La. App., 27 So.2d 444.
Plaintiffs then are obviously not entitled to the return of double the amount of the deposit.
We come then to the question of whether or not the defendant was within its right in attempting to put the plaintiffs in default and whether it, the defendant, is justified in retaining the deposit. This right is claimed on three grounds: First, the vendor contends that the vendees had no right to object to the fact that a portion of the property which they intended to buy was not included in the description, for the reason that in the contract, although the property sold was referred to as certain numbered lots, the description, such as it was, contained the additional printed words, "or as per title"; second, defendant asserts that there was no necessity that the vendees be put in default for the reason that they made it impossible to carry out the contract when the two lots of ground which, under the contract, were to be mortgaged to secure the collateral note for $1,000 were sold; and third, defendant declares that the vendees were formally put in default by the letter which, on March 27, 1941, its attorney wrote to the attorney for the vendees.
As to the first contention of the vendor that the vendees had no right to object to the fact that a substantial portion of the property, which all parties intended should be included in the sale, was not included in the description, cannot be taken seriously by us. The words, "or as per title," were printed in the form, and under no circumstances could we permit them to be used to deprive the vendees of a very large portion of the property which obviously was intended to be sold. Furthermore, the record shows that as soon as this discrepancy was called to the attention of the vendor, it readily agreed that the title should be corrected so as to include this additional property.
In connection with the second contention, it will be remembered that under the terms of the contract, the vendees agreed *Page 828 
that as collateral security, they would give to the vendor a note for $1,000 which would be secured by the mortgage of two lots of ground which were not in any way involved in this sale and which were located elsewhere. Those two lots were sold to third persons on July 13, 1940, and it is argued on behalf of the vendor that when they were sold it was no longer possible for them to be mortgaged to secure the collateral note for $1,000 and that, therefore, since the vendees made it impossible that they carry out the terms of the contract, they were automatically in default and there was no necessity that they be put formally in mora. The answer to this contention is clear. The record leaves it beyond question that that mortgage was to be given merely because the vendees could not at that time obtain sufficient cash to make the cash payment which the vendees really wanted, and that it was only agreed that the cash payment would be only $560 because the collateral mortgage could be given on the other property. Under these circumstances, it is very evident that the purpose which was sought to be accomplished by that stipulation could have been fully accomplished by the payment by the vendees of $1,000 out of the sale price of those two lots, as well as by the giving of the collateral mortgage. In other words, had the vendor actually sought to force the vendees to take title and had the vendees then instead of giving the collateral mortgage for $1,000 tendered cash for that amount, the vendor could not have refused to accept this tender. It is argued that the vendor's special reason for wanting the mortgage instead of the actual cash was a desire that, for income tax or capital gains tax purposes, it should not receive more than a certain percentage of the purchase price in that one year. However, the stipulation itself shows that the vendees were given the right to pay this $1,000 at any time prior to or on the date of its maturity and, in fact, were given the right to pay the entire balance of the purchase price of the five lots at any time on or before the day on which the final installment would mature, and it is evident that had the vendees desired to do so, they might have paid the entire purchase price in cash. Having agreed to this, defendant cannot now contend that it insisted on delayed payment in order to make certain that in that one year it would not receive more than a certain percentage of the purchase price.
That the vendees might substitute cash for the collateral note is made evident by the fact that in the contract it was provided that the note might be paid on or before its maturity. If so, then surely there was no need for its actual execution at all. Cash might have been substituted.
As to the acceleration of the installment payments on the principal obligation, we find a stipulation that the vendees would have the right to make "additional payments in excess of the monthly installment of $100.00 provided herein, such additional payments are to be applied to the last maturing installments. In other words, these payments are to be applied in inverse order." There is no limit placed on the right of the vendees to make such additional payments. Consequently, they might have executed the vendor's lien note and immediately paid it in full. If so, surely they could have said that instead of executing the note at all, they would pay the entire balance in cash. For these reasons we find no logic whatever in the contention that the vendees were automatically in default when, by the sale of the two lots, they made it impossible to execute a collateral note secured by mortgage on those two lots.
Nor do we feel that as a result of the letter of March 27, 1941, the vendor may claim that the vendees were put in default and that therefore the deposit may be retained by the vendor. That letter did not attempt to actually put the vendees formally in default. It merely expressed a warning that they might be put in default if they did not, within three days, signify their willingness to take title. Not only do we not consider that it did not put the vendees in default, but in addition, we are of the opinion that at that time the vendor had no right to put the vendees in default. There had been an unconscionably long delay in the perfecting of the title, and eight months before that letter was written, on March 27, 1941, the attorney *Page 829 
for the vendees had written to the attorney for the vendor asking that the final encumbrance be erased. After that letter was written, the vendees were obligated to wait a reasonable time, but by no stretch of the imagination could they be required to wait so long a time as eight months.
Our conclusion is that neither party had the right under the circumstances shown here to put the other in default, and all parties should be left in the position in which they were before the contract was entered into. Accordingly, the deposit should be returned to the plaintiffs.
The judgment appealed from is amended so as to read as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiffs, William S. Coci and Emanuel D'Antoni, and against the defendant, Johness, Inc., in the full sum of $560, with interest from judicial demand, each party to pay their or its own costs.
Amended and affirmed.