35 So.2d 25

**JOHNSON v. SHREVEPORT PROP-
ERTIES, Inc., et al.**

No. 38244.

March 22, 1948.

Phelps, Dunbar, Marks & Claverie, of New Orleans, and Foster, Hall & Smith, of Shreveport, for plaintiffs and appellants.

Milling, Godchaux, Saal & Milling and Sidney G. Roos, all of New Orleans, for defendants and appellees.

HAMITER, Justice.

In the instant case W. Harry Johnson sues to recover double the amount of earnest money ($5000) deposited by him under and in connection with his alleged agreement to purchase real estate owned by Shreveport Properties, Inc. Those made defendants are the said owner, its real estate agent, Newton B. Stoer, with whom the deposit was made, the Protective Committee for W. K. Henderson Iron Works and Supply Company, Ltd. (which owned all the outstanding capital stock of Shreveport Properties, Inc.), and the individual members of that committee.

In a companion case styled Newton B. Stoer v. Shreveport Properties, Inc., et al, La.Sup., 35 So.2d 31,[1] the plaintiff therein seeks a judgment of $3625 against the named owner corporation, and also against the mentioned committee and its members, for a realtor's commission or fee allegedly earned by him in arranging a sale of the real estate for Shreveport Properties, Inc., to W. Harry Johnson.

The actions were consolidated, and tried together on their merits, in the district court; but separate judgments were rendered. The demands of W. Harry Johnson were rejected except as to Newton B. Stoer, against whom there was judgment in the sum of $5000, the amount of the deposit placed with him. Stoer's suit was dismissed as to all defendants.

From the judgments Stoer and Johnson appealed. Appellees have answered the appeals, praying that their exceptions of no cause of action, urged in the district court, be maintained.

We find no merit in the exceptions. Under them it is first contended that the pleadings of both appellants show conclusively that Johnson's offer to purchase was not accepted. The petition in each case alleges an acceptance of the offer, and the documents annexed thereto lend support to the allegation. Secondly, under the exceptions, it is argued (quoting from the brief of appellees' counsel) that:

"But there is another reason why said exceptions of no cause of action should have been maintained, as to Mr. Johnson. His petition alleges—through the attach-

---

[1] 213 La. 503.

ment of his offer, of date January 30, 1943, that he was to have fifteen days, after delivery of the abstracts to him, for examination of the title and consummation of the sale.

"He then alleges that he requested that the abstracts be delivered to his attorneys and that they were so delivered on March 4, 1943, and that the attorneys approved the title on March 16, 1943. That left Mr. Johnson but three days, or until March 19, 1943, to consummate the sale (even had his offer been accepted—which is not the case) but your Honors will find no allegation that Mr. Johnson made any attempt to consummate the sale within the fifteen days after delivery of the abstracts, nor any allegation that said period of fifteen days was extended. On the contrary, he alleges that it was not until April 13, 1943—forty days after delivery of the abstracts—that he signified his readiness to take title. Now, we respectfully submit that it is elementary, in Louisiana, that a plaintiff must show that he has complied with the terms and conditions of his contract before he can recover thereon. * * *"

If time were of the essence of the contract under consideration the argument thus made might be effective. But the pleadings, which are being assailed, together with the annexed documents, do not show that to be true. In fact, incidentally, on the trial of the case it was clearly and definitely disclosed that the fifteen day period stipulated for the consummation of the sale was of no importance and further that it had been waived by the parties.

At to the merits of the litigation the record reveals that for some time prior to January 30, 1943, the real estate in question, which is situated in Shreveport and consists of three separate tracts, belonged to Shreveport Properties, Inc. All of the outstanding capital stock of that corporation was owned by a group known as the "Protective Committee for W. K. Henderson Iron Works and Supply Company, Ltd., First Mortgage Six and One-half Percent Serial Gold Bonds, Dated: June 1, 1928." This Protective Committee also owned all of the debts due by the corporation. C. G. Rives, Jr., occupied the dual capacity of President of Shreveport Properties, Inc., and of Chairman of the Protective Committee.

On June 29, 1942, C. G. Rives, Jr., to the knowledge of the other members of the Protective Committee, granted to Newton B. Stoer, a licensed real estate broker of Shreveport, an exclusive listing for the sale of the property. The written authorization provided for selling it either in whole or in part; fixed a price for the sale of the tracts separately and another and different one ($158,500) for selling them collectively; and stipulated a commission to be paid the broker, being certain percentages of the sale price. The listing was accepted by Stoer in a letter of July 2, 1942.

Pursuant to the employment contract, Stoer endeavored to interest various pros-

pects in purchasing the property, and kept Rives informed as to his progress. Among these prospects was W. Harry Johnson. Regarding his negotiations with Johnson, Stoer, on January 25, 1943, wrote the following to Rives:

"My main reason in writing this letter to you is to tell you that I have had another contact with W. Harry Johnson regarding the purchase of the property, and although he made it clear that he was not definitely making the offer, he intimated that he likely would pay the sum of $135,000.00 for all of the property involved. It was understood that I was to make this information known to you and upon receipt of a letter from you after your consideration of this information, I am to contact Mr. Johnson again.

"I will appreciate it if you will consider what I have said herein and write me about you consideration of it in such a manner that if need be, I can let Mr. Johnson read your letter; however, if you find it advisable, you might write a second letter of explanation going into detail to guide me in representing you."

To this suggestion Rives gave a telephone reply, obviously favoring the reception and entertaining of a proposal by Johnson to purchase, for in Stoer's next letter to Rives, dated January 30, 1943, he commented:

"Enclosed you will find the offer to purchase the Shreveport Properties, Inc., property, the former W. K. Henderson Iron & Supply Works property, located here in Shreveport, *as per long-distance telephone instructions from you.*

"The offer is sent to you in triplicate signed by the purchaser. I respectfully request that those in authority sign all three (3) copies and affix the date at the time it is signed. You are to retain one (1) copy for your files and return two (2) copies to me, one to be delivered to the purchaser and the other to be filed in our office with the escrow feature, wherein I hold the deposit of Five thousand and no/100 Dollars ($5,000) subject to the terms of the contract.

"Immediately upon receipt of your acceptance of this offer, I will deliver a signed copy to the office of the purchaser, and should inform him at that time that you have authorized me to obtain abstracts down to date for delivery to him, at which time I will take an official receipt for the abstracts and have the receipt dated over his signature and return a copy to you to be attached to the papers enclosed herewith. After getting the negotiations for this deal developed as outlined above, I will follow same through to the consummation of same, keeping you advised when necessary." (Italics ours.)

The enclosed offer of Johnson, evidently prepared by Stoer because it was written on his letterhead, reads as follows:

"N. B. Stoer, Realtor
"210 First National Bank Building
"Shreveport, Louisiana

"Through you, as agent for the owners, I offer to purchase the following described real estate: (Here follows description of property.)

"For the above described real estate I agree to pay the total sum of One Hundred Thirty-five Thousand and no/100 Dollars ($135,000.00) in cash at the time the act of sale is signed passing the title to me.

"This offer is subject to existing leases and rental agreements that exist between the present owners and the tenants now on the property; this offer is also subject to the property described herein as having a good and merchantable title and being free of all encumbrances except the rental agreements now in existence.

"It is agreed and understood between the present owners and myself that the taxes for the year 1943 and the rental income as provided for by the present rental agreement shall be provided as of the date of the act of sale passing title to me.

"The present owners shall deliver to me an abstract of title to all of the above described real estate for the purpose of examination; the said abstracts are to become my property at the consummation of this sale.

"I hand you herewith attached my check made payable to your order as Agent for the amount of Five Thousand and no/100 Dollars ($5,000.00) as earnest money which you are to cash and hold the funds there-

from in escrow, subject to the property described herein as having a good and merchantable title; this said deposit and earnest money shall be delivered by you to the owners of the property described herein after the examination of the abstracts of title and at the time the act of sale is signed passing title to me.

"You are hereby given five (5) days after the date of the receipt of this signed offer to obtain the acceptance thereof by the owners; and if accepted, this offer shall be signed by the owners and delivered to me within the time allowed; and it is understood that I am to have fifteen (15) days after the date of the delivery of the abstracts to me for the examination of the title and the consummation of this sale.

"Thus done and signed in triplicate this 30th day of January A.D. 1943."

The three copies of Johnson's offer were not signed by "those in authority," as Stoer had requested. Instead, on February 3, 1943, within the five days stipulated in the offer, Rives, as President of Shreveport Properties, Inc., and as Chairman of the Protective Committee, wrote and signed the following letter:

"Shreveport Properties, Inc.
"New Orleans, February 3, 1943.
"Mr. N. B. Stoer
"First National Bank Building
"Shreveport, Louisiana
"Dear Newt:

"This will acknowledge your letter of January 30, enclosing the offer by Mr. W. H. Johnson to you under date of Janu-

ary 30, 1943, offering to purchase certain property in Shreveport owned by the Shreveport Properties, Inc., being the former W. K. Henderson Iron and Supply Works property located in Shreveport.

"The members of the Protective Committee for W. K. Henderson Iron Works and Supply Co., Ltd., First Mortgage Six and One-half Percent Serial Gold Bonds, Dated: June 1, 1928 (which Committee owns all of the stock of Shreveport Properties, Inc.) *as well as the Officers of the Shreveport Properties, Inc., are willing to sell said property to Mr. Johnson for the price stated.* The abstract for this property is in the hands of Pugh, Grimmet and Boatner, 514 Ricou Brewster Building, and we will authorize them to deliver said abstract to you and authorize you to have it brought up to date.

"As to the delivery of the title of the property, it can be delivered immediately by the Committee in the form of all of the capital stock of the Shreveport Properties, Inc., together with all of the indebtedness of the Shreveport Properties, Inc., all of which are owned by the Bondholders Protective Committee. It is entirely possible Mr. Johnson would prefer to retain this corporation and get the benefit of the tax base it has established. He could very readily ascertain from R. V. Whittaker and Company, accountants for the Shreveport Properties, Inc., or his own accountant, that the Shreveport Properties, Inc., has no other indebtedness other than that being de-

livered to him. If, however, he does not need this corporation, it can be readily liquidated by him and he would have the property free and clear of all liens.

"However, if he does not want title in this manner, there will necessarily be a delay incident to the corporation being liquidated by the Committee to Mr. Johnson. If title is given in this manner, it will be necessary to have proper approval by the Commissioner of Internal Revenue.

"I believe, however, the attorney for Mr. Johnson could easily ascertain from R. V. Whittaker and Company that the statement of the Shreveport Properties, Inc., shows all of its obligations, all of which would be transferred to Mr. Johnson, together with all of the stock." (Italics ours.)

Returned with this letter to Stoer were two copies of the Johnson proposal to purchase.

Thereafter abstracts of title were furnished to Johnson and on March 16, 1943, he received an opinion from his attorneys stating that the Shreveport Properties, Inc., possessed a good, valid and merchantable title in and to the property. But prior to the last mentioned date, as well as subsequent to it, considerable correspondence was indulged in and much thought given by the interested parties and their agents relative to the manner of Johnson's taking title to the property. Illustrative of this is a letter addressed to Rives, dated February 17, 1943, and written by the law firm

of Foster, Hall & Smith, in which the following was said:

"Mr. W. H. Johnson has asked that we pass on the matter of the way in which he should take title to the W. K. Henderson Iron Works and Supply Company properties; that is whether to take a deed direct from the Shreveport Properties, Inc., or simply acquire the stock of Shreveport Properties, Inc."

Eventually, Johnson informed Stoer of his decision to accept title to the property from Shreveport Properties, Inc., rather than to take over the stock of the corporation, and Stoer on April 13, 1943, conveyed this information to Rives. Before any definite action was taken relative to Johnson's decision, however, Rives, on April 18, 1943, died.

On April 20, 1943, Stoer wrote to the president of the Whitney National Bank of New Orleans expressing regret and sympathy on the passing of that institution's vice-president, and making reference to Rives' acceptance, in his letter of February 3, 1943, of Johnson's offer to purchase. Regarding the acceptance Stoer said:

"The offer of January 30, was mailed to Mr. Rives, who did not sign the offer, but he did accept the offer in his letter of February 3, 1943, and signed as Chairman of the Protective Committee for the W. K. Henderson Iron Works and Supply Company First Mortgage 6½% Serial Gold Bonds Dated June 1, 1928, and also signed for the Shreveport Properties, Inc., C. G. Rives, Jr., President. In his letter Mr. Rives stated that the Corporation would either convey the fee title of the property or would transfer the stock, but he suggested that the purchaser consider taking the entire stock ownership of the corporation, and Mr. Johnson considered doing this in great detail, but he finally decided to accept fee title.

"The purchaser has examined the abstracts which Claude arranged to have brought down to date and delivered to the purchaser's attorney, who found the fee title merchantable and acceptable, and the purchaser is now ready to accept title.

"The writer will appreciate your consideration of having this transaction carried through to consummation."

Stoer's letter was referred to the remaining members of the Protective Committee, and they, on May 19, 1943, replied, among other things, that:

"We, as the surviving members of the committee, are still ready and willing to sell, for $135,000.00 cash, all of the capital stock of Shreveport Properties, Inc., and all of the indebtedness of Shreveport Properties, Inc., to the committee; but that is all that was ever authorized, and is as far as we are willing to go at this time."

The last sentence, of course, meant that the members of the committee refused to have the corporation convey title to Johnson, the reason assigned in their letter being

that the proceeds from such a conveyance might constitute taxable income.

As a result of the refusal this suit, as well as the companion action by Stoer, was instituted. In both the respective plaintiffs contend that Rives, by his letter of February 3, 1943, unqualifiedly accepted Johnson's offer on behalf of Shreveport Properties, Inc., thereby creating a binding contract, and at the same time he made alternative proposals, respecting the transfer of the property, on behalf of the Protective Committee which owned all of the stock of the corporation, together with all of its indebtedness. Appellees, on the other hand, insist that Rives' letter did not constitute an acceptance of the offer. They maintain (1) that Johnson's proposal to purchase required that an acceptance be written on the bottom of the copies sent to Rives, which was not done, and (2) that the alternative methods suggested by Rives for Johnson's acquiring the property rendered his letter a mere counter offer.

█ There is no requirement that the acceptance of an offer be made in the same act. To the contrary this court has said:

"The circumstance that the acceptance was not by the same instrument is insignificant, since article 1804, Rev.Civ. Code, expressly provides that the acceptance need not be by the same act." Union Sawmill Co. v. Mitchell et al., 122 La. 900, 48 So. 317, 318.

█ The question of whether or not Rives' letter constituted an acceptance of Johnson's offer on behalf of Shreveport Properties, Inc., and, hence, effected a binding contract, must, we think, be answered in the affirmative. In that letter, addressed to Stoer and which made reference to Johnson's offer to pay to the owner $135,000 in cash, Rives said: "The members of the Protective Committee * * * *as well as the officers of the Shreveport Properties, Inc., are willing to sell said property to Mr. Johnson for the price stated.*" The corporation owned the property, and when the president thereof (who was authorized to act as hereinafter shown) agreed to Johnson's proposal there came into being a complete obligation on its part to deliver title. Civil Code Article 1803. Concurring were the three circumstances requisite for a perfect contract: The thing sold, the price and the consent. Civil Code Article 2439. (Italics ours.)

If it had never been intended that the corporation would deliver title—if Rives' letter meant, as appellees contend, that only the members of the committee would deliver the property in either of the alternative methods mentioned therein—why were the officers of the corporation referred to in the letter, and further why did Rives sign as president and on behalf of the corporation? If such were the true situation the intervention of the corporation and its officers would have been unnecessary. Moreover, in several of the letters written to Rives subsequently by Stoer, Johnson and others, mention was made that John-

son had not decided whether to take title from the corporation or to acquire its stock, and in not a single instance did Rives even intimate in replying to those letters that the corporation would not transfer title. This circumstance renders appropriate the provisions of Civil Code Article 1956, reading: "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."

Unquestionably, there was good reason for Rives, in the capacity of Chairman of the Protective Committee, to propose in his letter of February 3, 1943, the alternative methods for transferring the property. The committee owned not only all of the stock of the corporation but it also owned all of the indebtedness thereof; and it was eager, as shown by previous letters from Rives to Stoer, to sell the property and liquidate the indebtedness. In view of this, and obviously to facilitate and expedite the sale, Rives suggested a transfer of the stock as a possible advantage to Johnson; and he further suggested the other method of dissolving the corporation and having the committee transfer the property so that Johnson would be assured of obtaining an unencumbered title. There is nothing in Rives' letter of February 3, 1943, however, that precluded a transfer of title by the corporation, such as was contemplated by Johnson's offer which was addressed to Stoer as agent for the property's owner, Shreveport Properties, Inc.

Since the corporation has refused to transfer title to Johnson, as shown by the letter of May 19, 1943, he is entitled to recover from it double the $5000 earnest money deposited with his offer. "But if the promise to sell has been made with the giving of earnest, each of the contracting parties is at liberty to recede from the promise; to wit: he who has given the earnest, by forfeiting it; and he who has received it, by returning the double." Civil Code Article 2463. Furthermore, the completed contract of sale having been breached, Stoer must be paid by the corporation the real estate commission of $3625 which he earned.

But there is no liability for those sums on the part of the Protective Committee or the individual members thereof. Neither of the alternative proposals made by Rives as chairmen of the committee was accepted by Johnson; nor did the committee, or any of its members, give any guaranty in connection with the transaction. Further, Rives' signing of the letter of February 3, 1943, for and on behalf of the corporation was fully authorized, as appears from a formal resolution of its Board of Directors ratifying and confirming that act.

For the reasons assigned the judgment of the district court is reversed and set aside insofar as it dismisses plaintiff's suit against the defendant corporation, and there is now

judgment in favor of W. Harry Johnson and against Shreveport Properties, Inc., in the full sum of $10,000, together with five percent per annum interest thereon from May 19, 1943, and for all costs of this suit in both courts. In all other respects the judgment is affirmed.