105 So.2d 243

Samuel ZEMURRAY

v.

Arthur J. BOE, Register of Conveyances for the Parish of Orleans, and Creole Land Company, Inc.

No. 43504.

June 27, 1958.

Rehearing Denied Oct. 9, 1958.

Hamiter, J., dissented.

Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, for plaintiff-appellant.

Solomon S. Goldman, Henican, James & Cleveland, C. Ellis Henican, New Orleans, for appellants.

Milling, Saal, Saunders, Benson & Woodward, Deutsch, Kerrigan & Stiles, R.

Emmett Kerrigan, Christopher Tompkins, Polack & Rosenberg, Samuel I. Rosenberg, New Orleans, for intervenors.

Robert A. Ainsworth, Jr., Charles J. Rivet, New Orleans, for appellee.

TATE, Justice ad hoc.

Plaintiff appeals from district court judgment dismissing his suit to have declared expired an option to purchase certain property in Orleans Parish, granted by him on May 9, 1952 to defendant, Creole Land Company, Inc. ("Creole"); [1] and also from the trial court's decree granting, in accordance with Creole's reconventional demand, specific performance of the option agreement in question.

·By third party petition Creole joined as third party defendants Joe W. Brown and his wife, Dorothy Dorsett Brown, who on December 9, 1954 had acquired from plaintiff Zemurray certain immovable property, including that allegedly subject to Creole's option to purchase. These third party defendants likewise appealed from the trial court's judgment, which ordered them to join in the specific performance ordered by the court by Zemurray of the sale of the land subject to the option agreement.[2]

---

1. Plaintiff's suit further demanded the cancellation of said option from the conveyance records, for which purpose Arthur J. Boe, Register of Conveyances for the Parish of Orleans, was joined as co-defendant. After suit was filed, Boe's successor as Register of Conveyances was substituted as party-defendant.

2. Presently before us as appellees also are the Pines Construction Co., Inc. ("Pines"), certain creditors thereof, and the trustee of these creditors, which parties had intervened on the side of Creole as allegedly interested parties to seek recognition of the enforceability of Creole's option agreement.

Creole did not comply with one of the conditions of the option agreement by the date provided by said clause, and the substantial question of this appeal is whether (as appellants contend) non-compliance with this condition by the stated date ipso facto terminated any rights of Creole under the option agreement, or whether on the contrary (as appellees contend) after Creole's default in this regard, Zemurray was required, prior to a tender of performance by Creole, to put the latter in default by judicial demand to dissolve the contract on that account, in order to obtain as of right the dissolution of the option agreement. It is further urged by the appellees that, in any event, the plaintiff waived timely performance of this condition and/or is estopped to urge invalidity on account of this alleged default of the option agreement.

The option agreement from Zemurray to Creole of May 9, 1952, granted, for the sum of $500, the latter the option until May 9, 1954 to purchase approximately 677 acres of land in Sections 20, 21, and 22 of the New Orleans Lakeshore Land Company, at the price of $750 per acre, under certain specified terms. Certain "conditions precedent" to the exercise of the op-

tion granted by the instrument were imposed by Clause 6, 7 and 7A, by which no rights under the option were to be acquired by Creole unless certain acts were performed with regard to adjoining land in Section 19 which Zemurray had earlier (on June 21, 1950) sold to the Pines Construction Co., Inc. ("Pines") and with regard to the indebtedness still owed by Pines to Zemurray therefor.[3]

Clause 7 required the completion of one hundred additional residences upon the Pines tract, with sewerage facilities, prior to May 9, 1954, the terminal date of the option, as condition precedent to exercising the option; as a similar condition, Clause 7A required cancellation of tax liens affecting this tract (which tract was also subject to Zemurray's unpaid vendor's lien.)

The meaning and effect of the other "condition precedent", Clause 6, is the central issue of this controversy. This clause provides:[4]

"6. A condition precedent to the exercise of the option granted hereby is the acquisition by purchaser [Creole] from vendor [Zemurray] of, or the payment of the balance due on, the

3. The parol evidence, the admissibility of which is disputed, shows that Pines had, following its purchase of the Section 19 tract and its undertaking to construct a subdivision thereon, fallen into financial difficulties; and that Creole was formed to bail Pines out.

4. Note: In the opening paragraph of the option agreement, Zemurray is identified as "Vendor" and Creole as "Purchaser", and these appellations are used to identify the parties to the agreement throughout the contract.

note held by vendor and made by Pines Construction Company, Inc. for $149,-320.00 dated June 21, 1950 and secured by mortgage and vendor's lien on groves in Section 19 of the New Orleans Lakeshore Land Company Tract, and THIS OPTION WILL TERMINATE UNLESS SAID ACQUISITION OR PAYMENT HAS BEEN MADE ON OR BEFORE OCTOBER 21, 1952. *Vendor [Zemurray] reserves the right to foreclose or take other legal action as vendor may deem advisable in the event of default on the mortgage and vendor's lien securing payment of the said note, provided if vendor proposes to foreclose purchaser [Creole] will be given five days written notice before institution of foreclosure and in which five day period the purchaser may cure the default.*" (Capitalization and italicization ours.)

We are unable to see the ambiguity in this clause which appellees profess to discover, nor to find the meaning assigned to it by them.

The clause states that Creole must purchase or pay before October 21, 1952 the

mortgage note due by Pines for the purchase of some adjacent property,[5] as a condition precedent to acquiring the right to exercise the option to purchase the present property. The italicized second sentence of the clause, rather than indicating (as appellees profess themselves to believe) any intention to confer rights with regard to payment of the Pines' mortgage *after* October 21, 1952, simply in its context grants Creole the privilege of receiving five days notice and curing the default if *before* October 21, 1952 Zemurray wished to foreclose or to take other legal action with regard to the mortgage note owed him by Pines.

Much of the appellees' argument that the clause is ambiguous or contradictory with other agreements between the parties is based upon an incorrect assumption that Clause 6 somehow extended the date of payment as to Pines of the mortgage note owed by Pines.[6] To the contrary, of course, Zemurray specifically reserved therein his right to foreclose or sue upon the Pines' note, although agreeing as to Creole to give the latter firm five days no-

5. The evidence shows there was a balance due of approximately $99,000 due upon this note as of the date of the option agreement, May 9, 1952.

6. At p. 34 of the original Pines brief, this clause is the only basis cited for the statement that the Pines note, payment of the $99,000.00 balance of which was due on June 21, 1954, was extended by Zemurray. At p. 6 of the original brief

for Marion Kessler, Trustee, a similar statement is made, based upon a reference at footnote 15 to paragraph 7 of the Exhibit "Creole 22", which is an agreement of May 19, 1952 between Pines and Creole *to which Zemurray (the holder of the note) was not a party.* Such agreement, without the concurrence of the note's holder, could not of course have the effect assigned.

tice before taking such action against Pines.[7] The obvious intent of the italicized second sentence was to provide for Creole's rights vis à vis Zemurray should the latter decide in the interval before October 21, 1952 to foreclose upon the Pines' mortgage, the $99,000 balance of which would become due on June 21, 1952; not to affect any right Zemurray had against Pines, which latter firm was not a party to the agreement.

Likewise, we are unable to find that two side agreements between Zemurray and Creole evidenced by letters of the same date (May 9, 1952) as the option agreement between them, change the clear meaning of the option clause in question nor convert it into ambiguity. The letter from Creole to Zemurray introduced in evidence as "Creole 10", simply stated that the "option will not be delivered and become effective" unless certain acts were accomplished which were not inconsistent with the above clause or with the option agreement.[8] "Creole 11", a letter from Zemurray to Creole,[9] simply stated Zemurray's agree-

7. It is to be noted that in the credit sale of June 21, 1950, by Zemurray to Pines ("Creole 1", Tr–153), there is the standard clause to the effect that forbearance on the part of the holder of the note would not waive the right to demand performance by Pines of the conditions of the mortgage (Tr–155): "No failure of the vendor or any future holder or holders of the mortgage note to exercise any option to declare maturity of the principal debt or any other sums hereby secured under any of the foregoing covenants or stipulations shall be taken or deemed a waiver of right to exercise such option or to declare such maturity at any time thereafter under any of the said covenants or stipulations."

8. The text of Creole 10, a letter from Creole to Zemurray referring to acts which were accomplished immediately after the option agreement was executed (there are indications in the testimony that the written option agreement was held in escrow and not physically delivered until these conditions were complied with), is as follows, Tr–171: "You have this date granted an option to us to purchase certain groves in Sections 20, 21 and 22 of the New Orleans Lakeshore Land Company Tract. It is understood and agreed that the

said option will not be delivered and become effective unless and until the following have been done, to-wit: "1. Cancellation from the conveyance records of the Parish of Orleans of the option granted by you to the Pines Construction Company, Inc. on June 22, 1950, recorded in C.O.B. 570, folio 485. [Note: this option had expired under its terms on June 30, 1951. This option was cancelled in the records on May 26, 1952.] "2. The payment of the 1952 city taxes on the groves or parts of groves in Section 19 of the New Orleans Lakeshore Land Company Tract subject to the mortgage and vendor's lien securing the payment of the note for $149,-320.00 dated June 21, 1950, made by Pines Construction Company, Inc. and held by you. "3. Payment of at least $5,000.00 to the Collector of Internal Revenue on liens filed by the United States in the local mortgage records against the Pines Construction Company, Inc." [This was done on May 20, 1952]

9. Due to the importance appellees attach to same, the text of this letter from Zemurray to Creole is set forth in full, Tr–172: "This is to evidence my agreement this day made with you that I am the holder

ment to execute for the sum of $26,953.09 a partial cancellation of his mortgage upon certain of the property sold by him to Pines, without reference to whether or not Creole acquired any rights under the option agreement in question.[10]

Although under Clause 6 acquisition or payment by Creole of the Pines note (upon which there was then a balance due of approximately $99,000) by October 21, 1952 was required before Creole could acquire any rights under the option agreement, a balance of $64,654.62 (plus $3,228.-23 attorney's fees) was not paid until April 8, 1954, several smaller payments having been made earlier.[11] On April 3, 1954, prior to such payment, Zemurray's attorney had by letter to Creole demanded a duly executed release of the option in question as it had "terminated on October 21, 1952." (P-2; Tr-103) Following Creole's failure

of a certain mortgage note in the original sum of $149,320.00, executed by Pines Construction Company, Inc., per act before F. H. Lapeyre, Notary Public, dated June 21, 1950, registered in M.O.B. 1798, Folio 227, and secured by mortgage and vendor's lien on certain property situated in Section 19 of the New Orleans Lakeshore Land Company tract, fully described in the act above referred to; that I agree herewith that upon payment to me of $26,953.09, at any time on or prior to October 21, 1952, I will execute a release of said mortgage insofar and only insofar as it applies to the following described property:

"Groves 22, 24, 26, 28A and 30 of Section 19 of the New Orleans Lakeshore Land Company Tract, provided that the said note has not been filed in any court proceeding and provided further that said property has not heretofore been released from the said mortgage and vendor's lien."

10. An obvious purpose of such agreement was to preserve (whether or not Creole paid or acquired the Pines' mortgage note by the date specified) the right of partial cancellation as to the specified lots which the mortgage between Zemurray and Pines gave Pines *"provided not in default"* in payments due under the mortgage (see Tr-156), in the probable event that Pines defaulted in payment of the principal at the maturity date of June 21, 1952. It is to be noted that when, pursuant to an agreement to buy and sell executed between Pines and Creole, dated May 19, 1952 (see Creole 22, Tr-212), Pines sold to Creole on May 21, 1952 certain of the property in Section 19 acquired by it from Zemurray (see P. 9, Tr-116) the exact same amount ($26,953.09) of the total purchase price of $65,478.09 was specifically reserved from the purchase price due *Pines* as the sum required under the terms of Pines' mortgage to Zemurray for cancellation thereof, insofar as the parts of Section 19 thus bought by Creole were concerned.

11. This final payment was made after a letter from Zemurray to Pines of March 18, 1954 had requested prompt payment of said mortgage note and in which Zemurray (according to the letter) reiterated information earlier conveyed by Zemurray's agents to the effect that they considered Creole's option not to have been in effect since October 21, 1952. (Tr. 146) (Mr. Louis Goldstein, Tr-496, Mr. George Montgomery, Tr-530, and Mr. Coryell McKinney, Tr-537, all positively testified that Pines was informed the option was dead in conversations in June or July of 1953.) On April 6, 1954, two days prior to the final payment, Zemurray's attorney had again formally demanded of Pines payment of the balance due upon said mortgage note.

to do so, the present suit was filed on April 26, 1954.

Appellees successfully contended in the trial court that the condition above set forth as Clause 6 is what is known to our civil law as a resolutory condition, non-compliance with which terminated or revoked as of right Zemurray's obligations under the option contract only if (being an event depending on the will of a party to the agreement) Zemurray had formally placed Creole in default by filing suit before Creole's performance of the condition by paying on April 8, 1954 the balance due upon Pines' mortgage note. LSA–C.C. Arts. 2045,[12] 2046,[13] 2047;[14] Southport Mill v. Ansley, 160 La. 131, 106 So. 720; Gayden v. Louisville, Nashville, New Orleans and Texas R. Co., 39 La.Ann. 269, 1 So. 792.

Contrariwise appellants contend that the condition expressed by Clause 6—the payment or acquisition of the Pines' mortgage *on or before* October 21, 1952—is what is known to our civil law as a suspensive condition the occurrence of which was necessary to initiate any obligation on the part of Zemurray as set forth in the option agreement; that since this condition never occurred, Zemurray is not obligated under the agreement to sell the property to Creole. LSA–C.C. Arts. 2043;[15] Stack v. De Soto Properties, Inc., 221 La. 384, 59 So.2d 428; Conklin v. Caffall, 189 La. 301, 179 So. 434; Standard Oil Co. of Louisiana v. Milholland, 167 La. 707, 120 So. 59; see also, City of New Orleans v. Texas & P. Ry. Co., 1898, 171 U.S. 312, 18 S.Ct. 875, 43 L.Ed. 178.

12. "Art. 2045. The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.

"It does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place."

13. "Art. 2046. A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance."

14. "Art. 2047. In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition."

15. "Art. 2043. The obligation contracted on a suspensive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties.

"In the former case, the obligation can not be executed till after the event; in the latter, the obligation has its effect from the day on which it was contracted, but it can not be enforced until the event be known."

The distinction between a suspensive and a resolutory condition is summarized by LSA–C.C. Art. 2021:

"Conditional obligations are such as are made to depend on an uncertain event. *If the obligation is not to take place until the event happen, it is a suspensive condition; if the obligation takes effect immediately, but is liable to be defeated when the event happens, it is then a resolutory condition.*" (Italics ours.)

■ The general distinction between suspensive and resolutory conditions is described in 15 C.J.S. Condition, p. 810, as follows:

"A condition is suspensive (corresponding to the condition precedent of the Anglo-American law) *when its occurrence is necessary to initiate an obligation or juristic act;* when the latter is terminated by its occurrence it is called resolutive (resolutoire) and corresponds to the condition subsequent of Anglo-American law." (Italics ours.)

See, to the same effect, our recent decision in Dufrene v. Tracy, 232 La. 386, 94 So.2d 297.

Appellees urge that under this distinction, since by the present option agreement Zemurray granted Creole the option to buy the property herein until May 9, 1954, the condition of Clause 6 that the option would terminate unless the Pines mortgage were paid before October 21, 1952, is by its terms a resolutory condition because non-performance thereof defeats or dissolves or terminates the option previously granted by Zemurray.

The appellees' contention that non-performance is resolutory as dissolving an existing obligation by Zemurray (namely, the obligation to sell Creole the land in question if the option were accepted by May 9, 1954) overlooks that no such obligation existed; and the cases relied upon by appellees concerning obligations to sell which the obligor sought to have dissolved because of the obligee's non-performance timely (Honore v. Jones, 180 La. 109, 156 So. 191; Southport Mill v. Ansley, 160 La. 131, 106 So. 720; cf. also, Johnson v. Shreveport Properties, Inc., 213 La. 485, 35 So.2d 25)[16] are distinguishable on that account, Standard Oil Co. of Louisiana v. Milholland, 167 La. 707, 120 So. 59. For an op-

16. The other principal case relied upon by appellees in this regard is Gayden v. Louisville N. N. O. & T. R. Co., 39 La. Ann. 269, 1 So. 792, where a landowner had sold land with the understanding that the railroad would be built thereupon within eighteen months brought suit (after the railroad was completed) for breach of the obligation to make timely performance of the condition for which the consideration had already been furnished, falls under LSA–C.C. Art. 2046: "A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagement; in this case the contract is not dissolved of right * *."

tion, such as is involved in the present case, is merely "the * * * option [to the grantee] to accept or reject, within a stipulated time, an offer or promise to sell," LSA–C.C. Art. 2462; until accepted in accordance with its terms, neither party is obligated to performance thereof. LSA–C.C. Art. 2462; Moresi v. Burleigh, 170 La. 270, 127 So. 624; Bermuda Stock Farms Co. v. Gilliland Oil Co., 155 La. 949, 99 So. 708. There is thus no obligation to sell to be dissolved by non-performance timely.

■ Under the option agreement between the parties, the obligation of Zemurray here sought to be enforced—his alleged obligation to sell Creole the land in question for the stated consideration—only came into existence if certain things were done, including that: (1) notice be given in writing to Zemurray of the acceptance of the option by 5:00 P.M., May 9, 1954; (2) Pines' mortgage be paid or acquired by October 21, 1952; (3) 100 residences be completed on Pines' land by May 9, 1954; and (4) all federal, state, and city tax liens affecting Pines' land be cancelled. The occurrence of these conditions was necessary to initiate Zemurray's obligation to sell the land; they were conditions *suspensive* of the obligation of Zemurray to sell the land upon Creole's acceptance by May 9, 1954. Rather than terminating any such obligation, Creole's failure to pay or acquire the Pines mortgage by October 21, 1952, prevented its

coming into existence. Cf., Standard Oil Co. of Louisiana v. Milholland, 167 La. 707, 120 So. 59. It was just as much a condition exacted by Zemurray to be fulfilled as precedent to any obligation on his part to sell the land, that Creole accomplish such timely payment of the Pines mortgage by October 21, 1952, as it was that Creole make timely acceptance of the option in writing by May 9, 1954; and failure to fulfill either condition timely would prevent the initiation of any obligation on the part of Zemurray to sell the land.

■■ The record contains a great deal of parol and extrinsic evidence admitted over plaintiff's objection to prove that the intent of the parties, as also manifested by their subsequent conduct, was otherwise. The admission of this evidence was incorrect. It is only where the instrument is ambiguous as to the intent of the parties that such evidence is admissible. Dufrene v. Tracy, 232 La. 386, 94 So.2d 297. Where, as here, the intent of the parties as evidenced by the instruments executed by them is free from ambiguity, parol or extrinsic evidence is inadmissible as an aid in the construction to vary the terms thereof. Weber v. H. G. Hill Stores, Inc., 210 La. 977, 29 So.2d 33; Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65; cf., Rudman v. Dupuis, 206 La. 1061, 20 So.2d 363.

(The extrinsic evidence incorrectly admitted shows that Pines, following his ac-

quisition of the Section 19 land from Zemurray in 1950, fell into great financial difficulty, and that Zemurray in an effort to assist Pines and Pines' creditors, many of whom were Zemurray's personal friends, cooperated with the refinancing of Pines' operations through the vehicle of Creole by giving the latter a very favorable option to purchase the adjacent 677 acres here in question; it does not show, however, that Zemurray did not, as a part of the consideration for his cooperation in granting the favorable option, desire other than that the Pines mortgage be paid or purchased on or before October 21, 1952. That Zemurray may also have wished to avoid, if possible, his reacquisition by foreclosure of the Section 19 land previously sold to Pines, and that Zemurray may have hoped that by the development of Section 19 land his adjacent holdings would become more valu-

able, does not alter his having exacted, as a condition precedent to the acquisition by Creole of its valuable rights under the option agreement, the payment or purchase by October 21, 1952 of the Pines mortgage.[17] And although it may be stated that a fair deduction from this evidence is that, in order to assist the parties, Zemurray did not intend to foreclose upon the Pines mortgage before October 21, 1952, there is no evidence whatsoever that he agreed not to do so; and indeed, the italicized second sentence of Clause 6 above quoted demonstrates the complete absence of any such agreement upon his part.)

Pretermitting whether or not, under the facts of this case, parol or other extrinsic evidence was admissible to prove any waiver, by permitting performance, of the requirement that the Pines mortgage be

17. That Creole fully realized that, under the terms of the option agreement, it was obligated to pay or to acquire the Pines mortgage before October 21st, 1952, is indicated by reference to the agreement between Creole and Pines of May 19, 1952, introduced as Creole 22, Tr–212, whereby Pines agreed to sell to Creole for a certain sum certain of the land in Section 19 that Pines had acquired by Zemurray (See Paragraph 1, Tr–212), and to grant Creole an option to acquire all or most of the remainder (see Clause 4, Tr–215; Par. 6, Tr–217), wherein in Par. 7 in part it is stated, Tr–218: "As a condition precedent to Pines granting options to Creole as stated in Paragraphs 4, 5, and 6, *Creole agrees to acquire by purchase or assignment on or before October 21, 1952*, from Samuel Zemurray on the payment due on a note

held by Zemurray and made by Pines for One Hundred Forty-Nine Thousand Three Hundred and Twenty ($149,320.-00) Dollars (on which there is a balance of $99,393.43), dated June 21, 1950, and secured by mortgage", etc. It is of interest to note that Sigmund Pines, the President and principal stockholder of the Pines corporation, admitted under cross-examination that in 1956 he filed suit in federal court in Florida against the ex-President of Creole, on the ground that the latter had breached his agreement to furnish $60,000 which was to be used to pay the note in question held by Zemurray on or before October 21, 1952, as a result of which the mortgage note had not been paid by that date pursuant to the agreement and Zemurray had cancelled the option agreement in question. (Tr–430–431.)

paid or acquired by Creole before October 21, 1952,[18] the facts do not so show the same, nor do they show that Creole or its agents was ever accorded such extension of the condition of the option.[19]

Appellees further contend that Zemurray, by accepting from Creole the payment in full of the Pines note subsequent to October 21, 1952, is estopped to claim that the option agreement was terminated by Creole's failure to pay or acquire such note on or before such date; and/or that such conduct on Zemurray's part waived compliance by Creole with this condition. Pretermitting discussion of appellants' argument that an extension of time for performance of an agreement affecting the title to real estate must be in writing and cannot be established by estoppel, cf., Harrell v. Stumberg, 220 La. 811, 57 So.2d 692, such

18. Appellants cite to us many cases holding that an extension of the time given by a written instrument to purchase or sell immovable property, Harrell v. Stumberg, 220 La. 811, 57 So.2d 692; Di Cristina v. Weiser, 215 La. 1115, 42 So.2d 868, or of the time given by a written option to accept the same, Conklin v. Caffall, 189 La. 301, 179 So. 434; Barchus v. Johnson, 151 La. 985, 92 So. 566, must be in writing. Cf., Stack v. De Soto Properties, Inc., 221 La. 384, 59 So.2d 428; Hoth v. Schmidt, 220 La. 249, 56 So.2d 412.

19. At Tr–489, the ex-President of Creole describes a conversation with Zemurray's representative in mid-1953, which was specifically limited to a request for an extension in the payment of the unpaid interest and principal upon the *Pines mortgage;* but, as will be pointed out, Creole having purchased or optioned the Pines' land subject to said mortgage held by Zemurray, had an interest entirely independent of any interest under the option to avoid a foreclosure of this long overdue mortgage to which land upon which Creole had undertaken subdivision activities was subject. The self-saving testimony of the President of Pines that he didn't learn that Zemurray considered the *option* terminated until April, 1954 (Tr–463, 520), is contradicted to him by the letter of Zemurray dated March 18th, 1954, P–13, Tr–145, as well as by the testimony of associates or agents of Zemurray that they had informed him by mid-1953 that the option had been terminated by failure to pay the mortgage: see Montgomery, Tr–530; Goldstein, Tr–496; McKinney, Tr–537. A conversation in mid-1953 of Zemurray's representative with a representative of Maryland Casualty Company (which firm had become indebted on account of Pines' bonds and other liabilities assumed for several hundred thousand dollars), to the effect that before advancing an additional $10,500.00 for the account of Pines to various claimants, Maryland's representative requested information from Zemurray's agent as to whether Zemurray was going through with its "deal" or "transaction" (without reference to the option itself as distinguished from a forbearance to foreclose upon the overdue mortgage) to which Zemurray's agent replied, "As long as Mr. Zemurray was not getting hurt, it was all right"; Tr–478, 480, 481–2, 542; is without substantial contradiction as to substance. But we are doubtful that such conversation, even if as with a third person having any bearing upon the present question of a waiver as to Creole, could be interpreted to mean other than a general intention (as contrasted with a specific agreement) not to foreclose upon the overdue mortgage and to permit the optionee to acquire the property, especially with the proviso that they would not do so as long as Zemurray was not hurt.

contentions find no support in the present record.

The argument thus advanced with seeming sincerity assumes that Creole paid the Pines mortgage to Zemurray with its own funds and solely with the hope of securing the benefits of the option agreement in question.[20] However, such a contention completely overlooks the agreements between Pines and Creole contained in the Agreement to Sell and Option to Buy Property of May 19, 1952 (Creole 22; Tr–212), and of the Sales by Pines to Creole of its property in Section 19 previously acquired from Zemurray dated May 21, 1952 (P–9, Tr–116) and dated April 8, 1954 (P–10, Tr–132).

Under the first agreement described (Creole 22), Pines agreed to sell and Creole to buy certain of the Section 19 property for $65,478.09 (of which a certain portion was reserved for payment of Zemurray's mortgage) and Creole was given an option to buy the remainder of the Pines property. Paragraph 7 thereof states that, as condition precedent to the options granted by Pines to Creole to purchase Pines' land in Section 19, "Creole agrees to acquire by purchase or assignment on or before Octo-

ber 21, 1952" the mortgage note in favor of Zemurray.

By the second instrument described, the sale dated May 21, 1952 (P–9), Pines sold Creole certain of the land it had acquired from Zemurray for the sum of $65,478.09, of which $38,525 was paid in cash to Pines by Creole and of which the remainder ($26,953.09) was reserved from the purchase price since, as stated, Creole "will be required to pay the said sum of $26,953.09 to the holder of said mortgage note", i. e., Zemurray. (Tr–127.)

By the third instrument, the sale of April 8, 1954 (P–10), Creole acquired all or most of the remaining Pines land for the sum of $120,370, for which a promissory note of $37,300 was furnished and the remainder ($83,000) noted as paid in cash. (By letter of April 30, 1954, P–14, Tr–148, from Creole to Pines, the consideration was modified and the balance of the purchase price was paid to Pines.) This instrument contains the statement as to disposition of the cash consideration due by Creole to Pines, Tr–137:

"Purchaser takes cognizance that there is recorded against the property herein the vendor's lien and mortgage

---

20. We have earlier in the text at footnote 11, supra, pointed out that the major portion of the sum due upon this Pines note was not paid until April 8, 1954, after March 18 and April 6, 1954 when Pines was requested by Zemurray to pay the long overdue balance on this note (upon which Zemurray of course had the privi-

lege of foreclosing to the prejudice of the interest acquired by Creole in the land subject to the mortgage) and with full knowledge that on April 3, 1954, Zemurray had formally demanded of Creole the cancellation of the option in the records as terminated on October 21, 1952.

to secure payment of a certain original promissory note in the sum of $150,320.00 (on which there is a balance due of $62,657.83 plus 3½% per annum interest from June 21, 1953 to date) per act before F. H. Lapeyre, Notary Public, dated June 21, 1950, recorded in M.O.B. 1798, Folio 227, Parish of Orleans, *which said obligation has been paid in full by purchaser* from the proceeds of this sale.

"Purchaser likewise takes cognizance that there are certain U. S. Government tax liens recorded against the property herein, and there has been *deposited by purchaser with the undersigned Notary Public the sum of $17,000.00 cash with which to secure release of said tax liens.*"

Thus the payment by Creole to Zemurray of these substantial sums of $26,953.09 (P–9) and of $62,657.93 plus interest (P–10) upon the note due by Pines to Zemurray upon which there was a balance due as of May 19, 1952 of $99,393.43 when Creole agreed with Pines to acquire same as a condition precedent to exercising its option to acquire the Pines land (see Creole 22, Tr–218), rather than being payments made independently of any obligation to do so and solely to obtain the benefits of the option granted Creole by Zemurray, were payments which Creole was contractually obligated to make as part of the purchase price it paid Pines to acquire such lands for its own uses and its own subdivision activities. Likewise, when Creole paid the sum of $9,600 to Zemurray on July 31, 1953, the record indicates that such sum was reserved from the total purchase price received for the re-sale of some of the Pines land to a third person, in order to secure a cancellation of the mortgage held by Zemurray against such land in order to deliver a good title to the purchaser. (Tr. 403–404; see P–11, Tr. 138.)

It should be noted that, except for the final payment satisfying the mortgage liability in full and releasing as to the remainder of Section 19 acquired by Creole, each time Creole paid Zemurray the principal upon the Pines note, it did so from the proceeds received from the profitable re-sale [21] by itself of the land it had acquired from Zemurray's vendee and in order to obtain a partial cancellation of the mortgage held by Zemurray affecting the property thus sold by itself and to deliver a good title to its own vendees. (P–4, Tr. 105; P–5, Tr. 108; P–6, Tr. 111; P–11, Tr. 138.)

Likewise the interest payments [22] (insofar as not possibly paid by Pines through

---

21. The record indicates that Creole paid approximately one-third of the purchase price received from its vendees to Zemurray, retaining approximately two-thirds of the purchase price. Tr. 406–409.

22. Prior to final settlement, the following interest payments were made: 10/13/52, $3,478.77, 10/21/52, $1,159.59; 6/19/53, $2,265.30.

Creole, cf., P–7, Tr. 114) and the cancellation of any liens against the land (insofar as not from proceeds due Pines which Creole obligated itself to pay to the lienors as part of the consideration for buying Pines' lands, cf. Tr. 137) must be viewed—against Creole's claim of Zemurray's estoppel thereby—in the light of Creole's interest of preventing foreclosure upon (see Tr. 410) and claims against the lands acquired by it from Pines (or under option to it from Pines) upon which Creole was engaged in subdivision activities on its own account and presumably to make a profit. (See Tr. 391.)

▋ As we stated in Breaux v. Laird, 230 La. 221, 234–235, 88 So.2d 33, 38, 39:

"The doctrine of waiver or estoppel contravenes the legal rights of the person sought to be estopped, * * * Our courts and other jurisdictions universally hold that this doctrine should be applied only in exceptional cases where the application is necessary to effectuate justice or prevent injustice * * * [P]leas of this doctrine can be of no avail to the party urging same unless he has been clearly misled to his detriment or injury by the actions or conduct of the party against whom the plea is urged. * * *"

▋ We cannot find any such basis for the pleas of estoppel or waiver thus urged before us, and we are unable to see any justification whatsoever for the suggestion that Zemurray was unjustly enriched under the facts above stated by permitting Creole to pay the long overdue mortgage he held against land acquired by Creole.

It should be mentioned that Pines and the creditors of Pines by agreements dated May 19, 1952 (Tr. 47, attached to petition of intervention; and Tr. 212, Creole 22) received Creole's agreement to pay to Pines and on behalf of Pines' creditors an overrider of from $700–$1650 per acre on any acreage purchased from Zemurray pursuant to the present option. Any rights resulting to Pines or its creditors by such agreement, to which Zemurray was not a party, were of course dependent upon Creole's valid and timely exercise of the option granted to Creole by Zemurray.

For the reasons assigned, the judgment of the trial court is reversed and set aside. It is now ordered that there be judgment in favor of plaintiff, Samuel Zemurray, and against the defendants, Creole Land Company, Inc. and Edward L. Boesch (successor of Arthur J. Boe), Register of Conveyances for the Parish of Orleans, ordering the cancellation as expired and of no further force and effect from the conveyance records of the Parish of Orleans of a certain option dated May 9, 1952 granted by plaintiff to Creole Land Company, Inc. to purchase certain groves then owned by him in Sections 20, 21, and 22 of the New Orleans Lakeshore Land Company Tract; recorded at Conveyance Book 585, Folio 285. It is further ordered that the judgment in favor of defendant Creole Land Company,

Inc. upon its reconventional demand is reversed and set aside, and such reconventional demand is hereby dismissed. It is further ordered that the petitions of intervenors allied with defendant Creole Land Company, Inc. are likewise dismissed. The costs of these proceedings are to be paid by Creole Land Company, Inc. and its allied intervenors.

HAMITER, Justice (dissenting).

In the majority opinion it is stated that Creole's failure to pay or acquire the Pines' mortgage note by October 21, 1952 prevented Zemurray's obligation to sell *from coming into existence*. To me this statement seems incorrect. Such obligation to sell came into existence May 9, 1952 when Zemurray, for a valid and sufficient consideration paid to him, granted to Creole until May 9, 1954 the option to purchase.

Of course, clause 6 of the contract required as a condition precedent to the *exercise* of the option that Creole pay or acquire the mentioned mortgage note by a certain date, it specifically providing that "this option will terminate unless said acquisition or payment has been made on or before October 21, 1952." But this imposed condition, in my opinion, was effectively waived by Zemurray when, on April 8, 1954 and prior to the option's expiration date of May 9, 1954, he unqualifiedly accepted from Creole the entire balance due on the Pines' mortgage note ($64,654.62 plus attorneys' fees of $3,228.23). And having so received and thereafter retained such benefits Zemurray, I think, is estopped to repudiate his obligation under the granted option.

No one ought to enrich himself at the expense of another. Revised Civil Code Article 1965. Neither law, equity, nor good conscience will allow one to claim the benefits and at the same time escape the obligations of an undertaking. Sherer-Gillett Co. v. Bennett, 153 La. 304, 95 So. 777. See also Louisiana v. McIlhenny, 201 La. 78, 9 So.2d 467 (and numerous authorities therein cited).

I respectfully dissent.