120 So.2d 478

**JACKSON MOTORS, INC.**

v.

**CALVERT FIRE INSURANCE COMPANY.**

No. 44051.

April 25, 1960.

Rehearing Denied May 31, 1960.

Theus, Grisham, Davis, Leigh & Brown, Monroe, for appellant.

Hayes, Harkey & Smith, Monroe, for defendant-appellee.

HAMLIN, Justice.

Jackson Motors, Inc. appeals from a judgment of the trial court rejecting its demands under a comprehensive policy of insurance (issued to A. L. Beck and assigned by him to plaintiff) against Calvert Fire Insurance Company for $1,800, plus penalties and attorney's fees, a net loss alleged to have resulted from the destruction by fire of a 1953 Mercury Monterey four-door sedan.

The facts of record are to the effect that on the afternoon of October 25, 1955, A. L. Beck consulted with T. J. McBroom, a new car salesman for Jackson Motors, Inc., Monroe, Louisiana, concerning the purchase of a 1956 Mercury automobile. At the beginning of the interview, Mr. Beck's 1953 Mercury Monterey automobile, purchased in Brookhaven, Mississippi, financed by Commercial Credit Company in Brookhaven, Mississippi, and insured by Calvert Fire Insurance Company, was taken to the Company's used car lot some four blocks away to be appraised for trade-in purposes. The car was in good condition, fully equipped, and had been driven approximately 22,000 miles, and upon its return Mr. Beck accepted a valuation of $2,000. Conversation then ensued with respect to the purchase price of a new 1956 Mercury Montclair, and W. B. Jackson, President, General Manager, and principal owner of Jackson Motors, Inc., was consulted with reference to making a deal. A submitted price of $4,327 ($2,000 trade-in and $2,327 unpaid balance) was accepted by Mr. Beck, on condition that his monthly notes be less than $100 under financing to be handled by the vendor. Mr. Beck then proceeded to sign in blank a promissory note, an act of sale and chattel mortgage, and a VEH-1 form (application for title and license).

At that time, Mr. Beck owed one more payment of $97.70 on his 1953 Mercury. He had with him his insurance papers but not the pink slip necessary for transfer of title to Jackson Motors, Inc.

Following the above transactions, it was determined that the air conditioner had not been hooked up in the 1956 Mercury, the radio had not been connected, and a booster would have to be put on the brakes. Mr. Beck refused the loan of a demonstrator and with Mr. McBroom's permission drove home in the 1953 Mercury.

At 11:00 A.M. the next day, October 26, 1955, a representative of Jackson Motors, Inc. telephoned Associates Discount Corporation and applied for the financing of the 1956 Mercury for Mr. Beck. As a result of the conversation, credit checks had to be made with the Commercial Credit

Corporation of Brookhaven, Mississippi, the Good Housekeeping Center in Monroe, the Firestone Store in West Monroe, and the Monroe Credit Bureau. On October 27, 1955, Associates Discount Corporation issued to Jackson Motors, Inc. a check for the financing of the 1956 Mercury. The record does not disclose when credit approval was communicated to Jackson Motors, Inc.

Meanwhile, on the morning of October 26, 1955, Mr. Beck went to work in a car pool, leaving the 1953 Mercury parked in a shed located in the rear yard of the apartment house where he and his wife resided. When he returned home at approximately 2:30 P.M. that afternoon, his wife told him that there had been a fire just prior to his arrival and that the 1953 Mercury had been burned to a condition of almost complete destruction.

The foregoing information was conveyed to Mr. McBroom, who then called for Mr. and Mrs. Beck and drove them to Jackson Motors, Inc. Upon his arrival, Mr. Beck paid the last note due on the 1953 Mercury and gave the insurance policy and all papers concerning the car to Jackson Motors, Inc. He told Mr. Jackson that he would collect the insurance for the burned car and turn it over to him. Mr. Beck then accepted delivery of the 1956 Mercury. All papers signed in blank by Mr. Beck on October 25, 1955 were filled in and completed on either October 26, 1955 or October 27, 1955. His monthly notes were stated to be $98.00. The title certificate from the State of Louisiana, Department of Revenue, Motor Vehicle Division, is dated November 7, 1955.

On March 11, 1956, Mr. Beck formally assigned to Jackson Motors, Inc., any and all claims he might have against Calvert Fire Insurance Company for the destruction of the 1953 Mercury. When the Insurance Company refused to honor the claim of Jackson Motors, Inc. for the alleged net loss of $1,800 (it being determined that the car had a salvage value of $200), the instant suit was filed. Jackson Motors, Inc. also prayed for penalties and attorney's fees, claiming that the insurance company had acted in an arbitrary and capricious manner.

The trial court stated that the primary question posed for its determination was whether Mr. Beck had an insurable interest in the 1953 Mercury at the time of the fire. It found that A. L. Beck gave Jackson Motors, Inc. a valid title to the 1953 Mercury on the afternoon of October 25, 1955. It reasoned further that even if title did not pass until it was approved by Associates Discount Corporation, the evidence *indicated* that the sale was approved at 11:00 A.M., October 26, 1955, and that Jackson Motors, Inc. was notified within the hour. Because of its findings, the trial court rejected plaintiff's demands.

In its brief filed in this Court, appellant states that the trial court erred in the following particulars:

"(1) In holding that the negotiations of October 25, 1955, resulted in a completed sale, transferring title of the subject automobile and all interest of A. L. Beck to Jackson Motors, Inc.;

"(2) In finding that the condition precedent to the transaction of the parties in the form of prior credit approval was satisfied or performed, thereby completing the transaction before the fire in question;

"(3) In failing to find that A. L. Beck had an insurable interest in the automobile, despite the fact that legal title was passed, by virtue of his retention of 'marketable title,' his continued possession of the chattel, and his responsibility therefor."

Appellee makes the following concession in brief:

"At the outset we concede that if it be found that title to the trade-in was vested in Beck at the time of the fire that he had an insurable interest. In such event plaintiff would be entitled to recovery in this lawsuit. * * *"

We must first determine from the evidence of record whether the sale of the 1956 Mercury to A. L. Beck was dependent upon the approval of Beck's credit by Associates Discount Corporation and its consent to finance the car. If such approval and consent were contemplated by the parties, then the obligation was not executed until such approval and consent were secured and the sale was not complete on October 25, 1955 because of the existence of a suspensive condition.

"Conditional obligaions are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition; * * *" LSA–C.C. Article 2021. See, Dufrene v. Tracy, 232 La. 386, 94 So.2d 297; Wampler v. Wampler, 239 La. 315, 118 So.2d 423, opinion rendered Feb. 15, 1960.

T. J. McBroom, the salesman in the instant matter, stated that his authority in the case of a credit sale consisted of writing up the deal for the sale of a new car and checking with the used car salesman on the appraisal of any trade-in employed. He said that the only sale he could conclude was a straight cash deal. With respect to the instant transaction, he stated that it was not his responsibility to call Associates Discount Corporation. On direct examination, Mr. McBroom was asked whether he told Mr. Beck that it would be necessary to arrange financing on the automobile. He replied:

"I told him we would have to turn it in and submit it to the finance company and Mr. Jackson and get it o. k.'d."

Mr. McBroom stated that he discussed Mr. Beck's financial situation with Mr. Jackson, and that after they had figured out a way whereby Mr. Beck's monthly payments would be less than $100, he submitted the figures to Mr. Beck. His testimony, in part, is as follows:

"I pulled out the contract forms, taken a buyer's statement on him and wrote him up and he signed the open—just open blank forms because they hadn't been typed out or anything and then I filled out a little work sheet—something to give him to take home with him, just a regular little work sheet that we work by there and he was to take delivery on the car the following afternoon.

"Q. I see, now my recollection from the testimony which we have previously taken in this matter the papers consisted of a note and chattel mortgage did it not? A. Yes, sir, that's right.

"Q. And that was between Jackson Motor Company and Mr. Beck? A. Well it was on Associate's papers.

"Q. I know but the contract was between Jackson Motor Company and Mr. Beck is that correct? A. I assume it would be, yes.

*      *      *      *      *      *

"Q. And the sale was from Jackson Motor Company to Mr. Beck and the finance and everything was between the two was it not? A. Yes, sir.

"Q. And you also had an application form or a customer's—what did you call it? A. A buyer's statement.

"Q. A buyer's statement? A. Yes, sir.

"Q. Now on that I believe is certain information to determine where he works and how much he makes and that sort of thing is that correct? A. Yes, sir.

"Q. That is to assist the finance company in determining a man's credit is that correct? A. Yes, sir.

*      *      *      *      *      *

"Q. And you agreed to give him $2,000.00 for his trade-in being the 1953 Mercury? A. Yes, sir.

"Q. And all that was done on the afternoon of October the 25th? A. As far as the agreement—mutual agreement, yes, sir.

"Q. In other words you all agreed that afternoon to trade automobiles? A. Yes, sir, that is right.

"Q. And you agreed on all the figures? A. Yes, sir.

"Q. And these figures had been shown to Mr. Jackson—A. Only on

the financing end of it to work it out to where his notes wouldn't be $100.00.

"Q. Well you have already said though that— A. Yes.

"Q. Do you mean to say that Mr. Jackson didn't know you were going to give him $2,000.00 for the trade-in? A. Yes, he seen the figures but I mean he didn't really accept it. He just give me those notes to go back and see if Mr. Beck would accept the figures and buy the car at these figures.

"Q. Well did he tell you the deal wasn't acceptable? A. Well it depended on whether the finance company would reject—

\*   \*   \*   \*   \*   \*

"Q. Now you have stated here that you told Mr. Beck that this whole deal was contingent upon approval by the finance company? A. Yes, sir, it had to be submitted to the office of the finance company before final approval on it.

"Q. Now are you certain of that Mr. McBroom? A. Well I feel I am.

"Q. I mean could you be mistaken in your—that you made it clear to him that this wasn't a deal until the finance company approved it? A. Well I've never delivered a car yet without submitting it to the finance company. I mean I sell everything I sell on submittal basis on financing.

"Q. I'm asking you what you told Mr. Beck that afternoon? A. I probably—

"Q. Now if you don't remember why say you don't remember but unless you are positive I think in all fairness you should say that you are not— A. I'm not real positive because—

"Q. You are not positive— A. You can wind up in a deal so many different ways and say 'well your little car will be ready tomorrow afternoon, come back after it.' I mean you can end a conversation like that but I wouldn't—I don't remember the exact words I said, I sure don't.

"Q. Then you are not certain that you said to Mr. Beck 'this whole deal is contingent upon the finance company's approval' ? A. I'm not sure I did, no.

\*   \*   \*   \*   \*   \*

"Q. I asked you regardless of what you made clear to Mr. Beck, what Mr. Beck understood, was the deal complete—did you understand that it required the approval of Mr. Jackson and the finance company? A. I understood it. I mean I felt sure that the deal was complete as far as I was concerned because my job was finished because I had closed the deal and sold the car. I mean as far as the salesman's job is concerned.

"Q. Then it was up to the company and the finance company? A. That's right, up to the office and the finance company.

\*   \*   \*   \*   \*   \*

"Q. Mr. McBroom in dealing—in closing out a sale of a used car—I mean of a new car, taking in a trade-in and so forth or in this particular instance why did you want Mr. Beck to take a demonstrator? A. Well it is just something there that we always work by, rather me. If you don't have the new car serviced and ready to go and you can get your prospect or customer to go ahead and drive the car that they will feel more like they have bought an automobile rather than to go home and take the old car and and talk it over and *maybe back out on you.*" (Emphasis ours.)

Mrs. Sybil Baker, who was a secretary and notary for Jackson Motors, Inc. on October 25, 1955, stated that it was her job to complete the forms signed in blank by Mr. Beck. She affirmatively testified that she did not fill in the forms herein involved on October 25, 1955, the date affixed. At one point in her testimony Mrs. Baker stated that she completed the forms after the fire, supra. She also stated that this deal was not passed until after it had been approved by the finance company handling the credit.

W. B. Jackson stated that on October 25, 1955, he was the only person who had authority to close a credit deal for Jackson Motors, Inc. He said that the instant contract was between Jackson Motors, Inc. and Mr. Beck, and that the promissory note was discounted with recourse by Associates Discount Corporation. When questioned about the delivery of the 1956 Mercury to Mr. Beck, Mr. Jackson testified:

"The car wasn't actually delivered to him until such time as it was approved by the finance company and his license were purchased with the car, that is when it finally became a deal and was finally consummated so far as I was concerned.

\*   \*   \*   \*   \*   \*

"My final approval was given after the approval of the Associates Discount Corporation who were the purchaser of the contract."

Mr. Jackson's memory with respect to the date of delivery was not clear; he stated that the approval of the finance company was given during the morning of October 27, 1955. In this respect, he said:

"A. No, I don't recall the details in particular in the case except that he brought his insurance policy over to us and we reported the loss to Calvert Fire Insurance Company and we delivered the car after having received his insurance policy which was turn-

ed over to us for collecting from Calvert Fire. We accepted that insurance policy in lieu of the car. Certainly we wouldn't deliver a man an automobile with $2,000.00 worth of burned scrap iron over there you know.

"Q. Well—

"A. —Without some assurance of getting our money."

When questioned as to whether he told Mr. Beck about financing, Mr. Jackson stated:

"No, that is generally mostly understood. Most everybody understands that; if the deal is to be financed why it is certainly subject to being recalled if the finance company rejects it. * * *"

■ Richard Lee McIntyre, Collection Manager for Associates Discount Corporation on October 25, 1955 and now its Office Manager, stated that his records revealed the negotiations with respect to the purchase of a 1956 Mercury by Mr. Beck from Jackson Motors, Inc. He stated that the instant contract was called *in* to the finance company for approval on October 26, 1955 at 11:00 A.M. He said that Mr. Beck's credit was checked with the Commercial Credit Corporation of Brookhaven, Mississippi, the Good Housekeeping Center in Monroe, the Firestone Store in West Monroe, and the Monroe Credit Bureau. He said that his records did not reveal the time when the contract was actually purchased from Jackson Motors, Inc., but that the check was issued on October 27, 1955, and he could say that that date could be considered the date of purchase. When questioned about the date of October 25, 1955 being affixed to the contract, he stated that that date was employed for insurance protection. Mr. McIntyre admitted that some contracts are processed rapidly, but he had no recollection of the time required for processing the instant contract. He said that the call back approving this particular deal was made by a Mr. William Sherman who had since moved to Little Rock, Arkansas.

On October 25, 1955, A. L. Beck was a "rough neck" employed by Zach Brooks Drilling Company. He later moved to Citronelle, Alabama. His memory was vague as to the financial arrangements accompanying the purchase of the 1956 Mercury. He distinctly recalled the trade-in of the 1953 Mercury and the allowance of $2,000.

The gist of Mr. Beck's testimony is to the effect that he could not have purchased the 1956 Mercury had it not been financed. The evidence shows that he signed a document setting forth his credit references. This document, headed Associates on the upper left-hand corner and Purchasers Statement on the upper right-hand corner, is attached to the act of sale dated October 25, 1955.

A reading of the evidence, supra, convinces us that its preponderance is to the effect that it was the intention of the dealer (Mr. Jackson) and the purchaser (Mr. Beck) that legal title to the 1956 Mercury would not pass to Mr. Beck until the transaction was approved by Associates Discount Corporation. The evidence also reflects that the salesman (Mr. McBroom) was aware of the company's policies and made no false statements to Mr. Beck concerning them. On October 25, 1955, Mr. McBroom was anxious to sell and his desire was to satisfy Mr. Beck. Mr. Beck was a satisfied customer and accepted what was told to him; however, he distinctly testified that he could not have afforded a new car without financing by a company of the dealer's choice.

The obligation of Jackson Motors, Inc. to deliver the 1956 Mercury to Mr. Beck and the obligations of Mr. Beck to receive the car and turn in to the company his 1953 Mercury were contracted on the suspensive condition of approval of Mr. Beck's credit by Associates Discount Corporation.

"The obligation contracted on a suspensive condition, is that which depends either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties.

"In the former case, the obligation can not be executed till after the event;

* * *" LSA–C.C., Art. 2043. See, Dufrene v. Tracy, 232 La. 386, 94 So. 2d 297; Zemurray v. Boe, 235 La. 623, 105 So.2d 243.

"A sale, made with a suspensive condition, does not transfer the property to the buyer, until fulfillment of the condition." LSA–C.C., Art. 2471.

Having concluded that the contract between Jackson Motors, Inc. and Mr. Beck was not executed on October 25, 1955, since it was subject to the approval of Beck's credit by Associates Discount Corporation, we pass next to the question of whether Beck had an insurable interest in the 1953 Mercury at the time of the fire, October 26, 1955.

The evidence, supra, is uncontradicted to the effect that application for financing of the 1956 Mercury was made at 11:00 A.M. on October 26, 1955. There is no positive testimony as to when the contract was approved nor when notice of approval was communicated to Jackson Motors, Inc. The trial judge was of the opinion that notice was communicated within the hour. Mr. McIntyre of Associates Discount Corporation testified that some investigations could be made promptly, but nowhere in the record does his testimony disclose that the instant investigation was completed and the transaction approved before the fire occurred. Therefore, under the peculiar facts of this case—particularly the testimony of

Mr. Jackson, supra—we are constrained to conclude that approval of Mr. Beck's credit took place after the fire had occurred.

It follows that up until the moment of delivery of the 1956 Mercury to him on October 26, 1955, after the fire, Mr. Beck was still the owner of the 1953 Mercury or its salvage value and the claim for insurance for its net loss. Certainly, the 1953 Mercury formed a part of the contract between Mr. Beck and Jackson Motors, Inc. and was at Mr. Beck's risk until the contract was executed. LSA–C.C., Article 2044. Title to the 1953 Mercury could not be transferred to Jackson Motors, Inc. until the fulfillment of the suspensive condition of credit approval, supra. Therefore, the loss of the 1953 Mercury had to be sustained by Mr. Beck (LSA–C.C., Art. 2471), and the insurable interest in the 1953 Mercury vested in Mr. Beck at the moment of the fire. This interest means "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." LSA–R.S. 22:614.

■ Having found that title to the trade-in 1953 Mercury was vested in Mr. Beck at the time of the fire, we conclude that appellee, Calvert Fire Insurance Company, is liable to plaintiff for the net loss thereof.[1]

William T. Hance, an adjuster of claims for Calvert Fire Insurance Company, placed a value of $1,450 on the 1953 Mercury. This was a theoretical valuation made after the fire. We believe that the preponderance of the evidence is to the effect that the 1953 Mercury was well worth $2,000 before the fire. D. A. Shell, Used Car Manager for Jackson Motors, Inc., carefully examined the car on October 25, 1955, and his testimony is to the effect that the car was in excellent condition and was worth $2,000 for trade-in value. His valuation was accepted by Mr. McBroom, Mr. Jackson, and Mr. Beck. There is no dispute as to the $200.00 salvage value of the 1953 Mercury after the fire. We conclude that the net loss was $1,800.

■ Under the peculiar facts and circumstances of this case (especially the assignment of the claim and the conflict as to insurable interest), we do not believe that the actions of Calvert Fire Insurance Company, in refusing to recognize the claim for the net loss to the 1953 Mercury, were arbitrary, capricious, or without probable cause. LSA–R.S. 22:658. Mitchell v. First National Life Insurance Company of Louisiana, 236 La. 696, 109 So.2d 61; Clevy v. O'Meara, 236 La. 640, 108 So.2d 538. It had a valid defense, which was urged with probable cause.

1. See appellee's concession, supra.

For the reasons assigned, the judgment of the trial court is reversed and set aside. It is now ordered that there be judgment in favor of plaintiff, Jackson Motors, Inc., and against defendant, Calvert Fire Insurance Company, in the sum of $1,800, together with legal interest from June 5, 1956, until paid. All costs are to be paid by Calvert Fire Insurance Company.

**120 So.2d 485**