817 So.2d 69 (2002)
E.R. CAMPBELL, III, et ux.
v.
Harold Keith MELTON.
No. 2001-C-2578.
Supreme Court of Louisiana.
May 14, 2002.
*71 Tommy K. Cryer, Shreveport, Donald J. Ethridge, Dawn M. Fuqua, Michael R Mangham, Lafayette, Counsel for Applicant.
James F. Howell, Lamar P. Pugh, Francis M. Gowen, Jr., Shreveport, Counsel for Respondent.
*72 TRAYLOR, J.[*]
We granted a writ of certiorari in this case to review the lower courts' interpretation of a buy/sell agreement to purchase immovable property. We find that the lower courts improperly admitted parol evidence to determine the parties' intent regarding an unambiguous clause in the "additional provisions" clause of the contract. For the reasons that follow, we reverse the lower courts' judgments, and grant judgment in favor of the defendant.

FACTS AND PROCEDURAL HISTORY
On September 26, 1997, Edward and Kimberly Campbell entered into a purchase agreement with Harold Keith Melton for the purchase of Melton's home in Shreveport, Louisiana.[1] At the time of the agreement, Lynn Roos, a real estate broker, served as the dual agent for both Melton and Campbell. Through Roos, the Campbells made an "as is" offer of $400,000 for the house by a closing date "on or before December 8, 1997." In response, Melton assented to the price but countered with other conditions, including removal of the inspections clause in the contract. The Campbells countered again, in which Roos modified the purchase agreement at the Campbells' request to include an "additional provisions" clause that provided for acceptable roof, foundation and mechanical system structural reports and that "any single mechanical item repair that exceeds $2000.00 the Seller has the option to repair or the contract will be null & void." The final version signed by the parties contained this clause.
On Oct. 21, 1997, the Campbells informed Melton directly by fax the conclusions of the Campells' inspector, who found problems in the following areas: heating/ac, electrical, carpentry, plumbing/septic system, water softening system, mortar/brickwork, and tree hazards. The Campbells stated:
I would take a guess at the total cost to fix all of these problems in the $25,000 $40,000 range. There obviously are several single items that would well exceed the $2,000 threshold set in our contract and were not disclosed in the Homeowner's Disclosure Statement. I am willing to use best efforts to work through these issues and resolve them.
In response, on October 27, 1997, Melton faxed the Campbells: "After receiving your fax of 10-21-97 I believe it to be in your best interests to find a different residence. I am exercising my option under the `Additional Provisions' paragraph of the 9-26-97 sales agreement ... to declare it null and void."
The next day, the Campbells faxed Melton, stating that under the terms of the contract, it was the Campbells, not Melton, who had the option to nullify the contract. In that fax, Campbell then stated:
I was shown some of the deferred maintenance items when I first viewed the house. I agreed to take on these items and accept the house "as is" and I intend to keep my word. However, there were several items I was not shown nor were they disclosed. The items that concern me most involve the HVAC, electrical and water softening systems. At a minimum I consider you responsible for these items prior to selling to me.

*73 . . .
I estimate to remedy these items will cost approximately $15,000. As a consideration to you and as good faith on my part, I am asking you to rebate back to me only the cost to fix these items. I will handle all of the other items mentioned in my October 21, 1997 memorandum to you. I estimate $5,000 on HVAC, $3,000 on water softener and $7,000 on electrical but, it could be less.
The following day, on October 29, 1997, Melton replied: "It is my position, confirmed by consultation with counsel, that upon my declining to make the repairs exceeding $2,000, as is my option, the effect of that determination is that the contract is null and void by its own terms."
The Campbells then procured legal counsel. On October 30, November 3, and November 5 of 1997, Campbell's attorney forwarded Melton certified letters stating that Melton's interpretation of the "additional provisions" clause was erroneous and that Campbell "intend[ed] to close on the purchase of the property in accordance with and under the subject Buy/Sell Contract on or before December 8, 1997...." The attorney for the Campbells also explained that if Melton did not participate in the sale closing, legal action would be instituted. The attorney hired to perform the closing also sent a package to Melton, which included a settlement statement reflecting no deductions for repairs and informing him the closing date was set for December 2, 1997. Melton did not respond to any of the correspondence.
Melton's failure to appear at the December 2, 1997 closing precipitated further correspondence. In a letter dated December 4, 1997, Campbell's attorney described Melton's actions as "legal breaches and violations of the above referenced Buy/Sell Agreement dated September 26, 1997...." which entitled Campbell to file suit against Melton unless he complied with the agreement within five days of the letter. When Melton failed to do so, the Campbells instituted suit for breach of contract and specific performance and filed a Notice of Lis Pendens on December 18, 1997. In his answer to the petition, on January 29, 1998, Melton included a reconventional demand against the Campbells seeking attorneys' fees.
In the meantime, Melton had entered negotiations to sell the property to a potential purchaser by late November 1997. On December 23, 1997, Melton sold the residence to Millennia Group, L.L.C., through its manager, John Hensarling, who moved into the residence.[2] On that same day, Millennia sold a portion of the property to Huey and Melanie McGaha.[3]
On May 10, 1999, Melton sought a motion for summary judgment on the grounds that the "additional provisions" clause was unambiguous as a matter of law and provided that upon the discovery of any single mechanical cost over $2,000, Melton had the option to repair it or the contract, by its own terms, would be null and void. The Campbells followed with a motion for summary judgment on August 24, 1999 arguing that they possessed the option to void the contract and when they elected not to do so, Melton was bound to sell them the house for $400,000 by December 8, 1997.
In separate judgments, the trial court denied both motions for summary judgment *74 on December 6, 1999. After a two day trial in June of 2000, the trial court ruled in favor of the Campbells, finding Melton had breached the agreement. The trial court reasoned that the only sensible interpretation of the "additional provisions clause" was that the Campbells had the right to terminate the contract if Melton refused to repair any single mechanical item exceeding $2,000, "given the context of this agreement."
The trial court further concluded that the Campbells' communication of October 21st was a "gentile, [sic] soft approach," not a demand for repairs. The trial court also considered the Campbells' communication of October 28 to be an invitation for discussion, rather than a demand. Based on these conclusions, the trial court ordered Melton to convey full, complete and unencumbered title of the property to Campbell, nullified all property rights acquired by Millennia and the McGahas, and assessed Melton with attorneys' fees and court costs.
On appeal, the Second Circuit affirmed, finding that the "additional provisions" clause of the purchase agreement remained inoperative until some payment of over $2000 was demanded. Campbell v. Melton, 34,810 (La.App. 2 Cir 6/20/01), 793 So.2d 235. Applying manifest error, the Second Circuit affirmed the trial court's finding that Campbell had not made a demand for payment of any costs for repair in excess of $2,000 to activate the purchase agreement's nullity provision, and thus, Melton breached the agreement. In affirming specific performance as the adequate remedy, the court of appeal noted that "Millennia and McGaha purchased the subject property at their peril and assumed the risks inherent in the purchase of a home which has a title clouded by a notice of lis pendens."[4] Finally, the Second Circuit granted $1000 in attorneys' fees to the Campbells for successfully defending the appeal.
We granted a writ of certiorari to review the lower courts' conclusions. Campbell v. Melton, 01-2578 (La.1/4/02), 805 So.2d 1198.

LAW AND ANALYSIS
An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell. La. Civ.Code art. 2623. A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates. Id.
In this case, neither party disputed the execution of a valid purchase agreement on September 26, 1997. At trial, all parties agreed that it was their intent to buy and/or sell the residence for a price of $400,000 on or before December 8, 1997. Nevertheless, difficulties arose over the parties' differing interpretation of the "additional provisions" clause of the agreement.

Interpretation of Contractual Language
In interpreting contracts, we are guided by the general rules contained in articles 2045-2057 of the Louisiana Civil Code. The interpretation of a contract is the determination of the common intent of the parties with courts giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. *75 La. Civ.Code arts. 2045, 2047; see e.g., Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 93-0911 (La. 1994), 630 So.2d 759, 763. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. Civ.Code art. 2046.
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous. Ortego v. State, Through the Dep't of Trans. & Develop., 96-1322 (La.2/25/97), 689 So.2d 1358. A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. La. Civ.Code art. 1848 (formerly La. Civ.Code art. 2276); Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741, 748; Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981); Rudman v. Dupuis, 206 La. 1061, 20 So.2d 363 (La.1944). Contract interpretation of ambiguous terms requires construction against the contract's drafter. See La. Civ.Code art. 2056.[5]
Melton argues that the plain language of the contract prevents the admittance of parol evidence to prove contractual intent. Melton argues that the "additional provisions" clause is susceptible of only one reasonable interpretation: that upon presentation for repairs, Melton may choose to make the repairs, else the sale is null and void. Melton suggests that the purchaser had a choice: either to accept the property "as is" by remaining silent, or to reject by anything other than silence.
In response, the Campbells argue that it was proper to consider the parties' subjective intent because the contract had internal conflicts due to the inartful drawing of the "additional provisions" clause. The Campbells assert that because the parties interpretations are adverse, subjective intent is necessary to resolve their differences. The Campbells suggest that Melton's own trial testimony constituted an admission that the parties' subjective intent should prevail. Finally, the Campbells assert that the right to terminate the contract was theirs but was a right they never exercised.
The trial court agreed with the Campbells, and found that the contract provision was "inartfully drafted" by Roos. Although the trial court never made an express finding that the contract provision in question was ambiguous, the trial court allowed the Campbells to testify regarding their intent when drafting the provision, over the defendant's continuing objection to the admission of parol evidence.
On appeal, both Melton and Campbell continued to frame their arguments around the interpretation of the second sentence of the "additional provisions" clause, i.e., which party had the option to nullify the contract under certain circumstances. Under Melton's interpretation, it was Campbell's presentation of over $2000 in repairs which gave him the option to *76 nullify the contract. The Second Circuit found that under this reading of the clause, Melton could exit the agreement even when Campbell chose to pay for the repairs, and concluded that such an interpretation violated not only the overall intent of the parties, i.e., the sale of the house for $400,000, but led to absurd consequences. However, the Second Circuit declined to address whether the clause was ambiguous by finding that a demand for repairs sufficient to invoke the clause had never been made.
The "additional provisions" clause states that "any single mechanical item repair that exceeds $2,000.00 the Seller has the option to repair or the contract will be null & void." Both parties clung to characterizing the "additional provisions" clause as a form of option contract. More accurately, the clause is a resolutory condition within a contract. Article 1767 of the Louisiana Civil Code provides:
A conditional obligation is one dependent on an uncertain event.
If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.
If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory.
When viewed as a resolutory condition, the clause clearly states that the contract would terminate upon the happening of a condition, namely the discovery of a mechanical item that exceeded $2,000 to repair. Thus, an "option" to terminate did not exist and thus could not "belong" to either Melton or the Campbells. Rather, a plain reading of the unambiguous clause reveals that once the condition was fulfilled, the contract became null and void unless Melton opted to make the repairs.
The lower courts, while not stating as much, began their analysis as if the clause in question imposed a condition, but then deviated by considering the intent and conduct of the parties beyond whether they successfully invoked the fulfillment of the condition. The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of new contract when the terms express with sufficient clearness the parties' intent. Peterson v. Schimek, 2000-2644 (La.9/18/00), 767 So.2d 707; Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. The fact that one party may create a dispute about the meaning of a contractual provision does not render the provision ambiguous. See Slocum-Stevens Ins. Agency, Inc. v. International Risk Consultants, Inc., 27,353 (La.App. 2 Cir. 12/11/95), 666 So.2d 352, writ denied, 96-0102 (La.3/8/96), 669 So.2d 399.
However "inartfully drawn," a plain reading of the contract clause is clear. While the parties may now regret the finality of the clause's efficient operation, neither party dispute that they signed the contract. The fact that the clause may have operated differently than typical real estate transactions by terminating automatically once the resolutory condition was proven does not render the clause ambiguous.
The difficult facts of this case underscore how the lower courts erred in weighing those facts. There was no reason to decide this bitter dispute by becoming mired in the oftentimes disappointing conduct of all parties. Instead, the case turned on a legal question. The parties acknowledged the existence of the contract. Therefore, inquiry into the minds of the parties by the lower courts to interpret the "additional provisions" clause was *77 unnecessary and in error. The only real question became whether the contract was terminated by presentation of "any single mechanical item" requiring repairs that exceeded $2,000.

Demand for Repairs
Melton argues that the lower courts erred in holding that a demand was a condition precedent[6] to the termination of the contract. In the alternative, Melton argues that the court of appeal erred in not articulating a standard for what constitutes a demand, but that in no instance, can a demand be decided by a subjective intent inquiry. Rather, courts should measure the performance of a contract by objective actions.
In response, the Campbells argue that none of their communications amounted to a repair demand because they were still willing to pay the $400,000 purchase price after writing the letters to Melton. Thus, the Campbells urge that the lower courts correctly concluded the clause was never triggered.
Both parties agreed that it was Melton's refusal to make repairs which activated the relevant portion of the "additional provisions" clause. The Second Circuit reasoned that inherent in the act of refusal is the existence of a demand, stating that "common sense dictates that it would be illogical to conclude that one ever refuses to do something without first being asked to do it." We agree with the court of appeal's conclusion that implicit in that portion of the clause which gives Melton a choice to pay or refuse repairs over $2000 is the requisite that a demand be first made upon him by Campbell for responsibility of the costs. More importantly, we find that requirement explicitly provided in the contract's inspection clause that required the purchaser to give notice of any objection to the inspections in writing within five days.
The parties had deleted a portion of the standard form contract language regarding inspections during negotiations of the purchase agreement, as evidenced by a cross marking out the provision, and a cross reference to the "additional provisions" clause. However, the parties retained the following paragraph in the inspections provision:
Any additional inspection reports required by the purchaser, which are listed in the "additional provisions" of this agreement, at Purchaser's sole expense, shall be obtained within [45] days from Seller's acceptance of this agreement. A copy of such additional inspection reports must be afforded to Seller within five (5) days of completion of the inspections. Purchaser shall make known his/her objections to contents of such additional inspection reports in writing within five (5) days of completion of the inspections. Upon completion of such inspection, PURCHASER SHALL provide Seller or Seller's Agent/Broker with a copy of all inspection reports and if not satisfied with the present condition of the property as reflected in inspections reports shall indicate in writing his rejection of the property. FAILURE TO MAKE INSPECTIONS OR GIVE WRITTEN REJECTION TO SELLER OR SELLER'S AGENT/BROKER WITHIN *78 FIVE (5) DAYS SHALL BE DEEMED AS ACCEPTANCE BY PURCHASER OF THE PROPERTY'S PRESENT CONDITION. (Italics added).
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. Civ. Code art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. Civ.Code art. 2053. A provision susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. La. Civ.Code art. 2049. Reading the contract as a whole to give each provision effect, the clear and explicit intent of the parties was that the "additional provisions" clause providing for termination of the contract remained inoperative until repairs over $2,000 were requested in writing.
However, we disagree with the lower courts' conclusion that a demand for repairs over $2,000 in writing was never made. The record shows that there were two letters from Campbell to Melton which precipitated Melton to exercise his claimed option to nullify the contract. In its findings of fact, the trial court concluded that neither correspondence, dated October 21 and 28, 1997, which informed Melton of the results of the structural reports, qualified as formal demands but were rather "invitation[s] to discuss the matter...." Regarding the October 21, 1997 correspondence, the trial court relied on Campbell's testimony that his purpose in writing the letter was to inform Melton of the results of the inspections and of the numerous undisclosed defects or problems which were revealed.[7]
In relation to the October 28 letter, Campbell testified that when he wrote the letter, he was still willing to go forward and close on the house and absorb all that liability. Campbell explained that he was not demanding repair but simply informing Melton of the undisclosed problems which had been discovered and giving him an opportunity to cure them. The Second Circuit concluded that the trial court resolved the discrepancy in the letters in favor of Campbell's explanation that the language was merely informative. However, the lower courts' erred in considering an explanation from Campbell regarding the letters' content.
While we acknowledge that factual findings which are pertinent to the interpretation of a contract will not be disturbed absent manifest error, we can only conclude from review of the record that the trial court manifestly erred when it looked outside the writings of the parties to consider parol evidence regarding Campbell's intent in discussing the repair items. Even if we were to consider the October 21 letter an "invitation," rather than a demand for repairs exceeding $2,000, we fail to see how Campbell's subsequent letter on October 28 could be *79 construed as another "invitation" after Melton's response stating his intent to nullify the contract based on the "additional provisions" clause. The Second Circuit acknowledged the "obvious point of difficulty" in the letter's language that held Melton responsible for repair of the three mechanical systems or reduction in the purchase price to the tune of $15,000. The obvious language in Campbell's letter cannot be overcome because we can see no reason that Campbell would have written the letters if he did not expect some payment or rebate for repairs that he identified would cost over $2,000.
Further, the resolutory condition for repairs over $2000 could only be invoked by a signed writing according to the contract's express terms.[8] Therefore, it was proper to look only into the parties' writings to determine whether Campbell had proved up the fulfillment of the condition terminating the contract. While the Campbell's communication of October 28, 1997 was couched in polite terms, there was little doubt that when the interpretation was confined to only the four corners of the document, that signed writing constituted a demand for repairs in excess of $2,000 that terminated the contract between the parties. The Campbells' subsequent actions in an attempt to close the sale could not prevent the clause's operation to void the contract once the demand for repairs was made.

Mootness
The McGahas have filed a brief on appeal, attaching a cash sale deed and settlement agreement that purports to show that the property has since been transferred to the Campbells. The McGahas argue that the enforceability of the buy/ sell agreement is moot because the object of the contract, namely the transfer of the property, has been accomplished.
First, we note that to receive the settlement and deed offered in evidence by the McGahas would constitute the taking of evidence and the exercise of original jurisdiction in a matter in which neither the court of appeal nor this court is vested with authority to do. White v. West Carroll Hospital, Inc., 613 So.2d 150 (La. 1992). This is not a matter dealing with correcting erroneous records or supplementing records which are deficient as to matters actually introduced in evidence. Barber v. Testa, 331 So.2d 139, 140 (La. App. 3d Cir.1976). Accordingly, this court cannot consider evidence which was not part of the record made in the trial court in this suit.
Furthermore, although a case may be remanded for introduction of additional evidence, this power must be exercised sparingly, limited to cases wherein the evidence was unobtainable with due diligence for the first trial and the record reflects that the new evidence is likely to affect the outcome of the case. See Duncan *80 v. State, Through Dep't of Trans. and Develop., 92-2174 (La.2/2293), 615 So.2d 305; Herbert v. Travelers Indemnity Co., 255 La. 645, 232 So.2d 463 (1970). In the instant case, the settlement between the Campbells and a third party, who are not properly before this Court on appeal, still leaves unresolved the rights and duties of the Campbells and Melton vis a vis each other.
Second, we agree with Melton's argument that the issues between Campbell and Melton are not rendered moot by the subsequent transfer of the property to the Campbells. A moot issue is one that has been deprived of practical significance, made abstract or purely academic, and has no subject matter upon which the judgment of the court can operate. Perschall v. State, 96-0322, (La.7/1/97), 697 So.2d 240, 253. A judgment on the enforceability of the contract will potentially determine the parties' respective rights regarding attorney's fees, liability for real estate commissions, and title to the property despite any subsequent transfer that may render specific performance impractical.

Attorney Fees
Both parties have prayed for reasonable attorney fees associated with these proceedings. As a general rule, attorney fees may not be awarded to a successful litigant unless specifically provided for by statute or contract. See Curtis v. Curtis, 28,698 (La.App. 2 Cir. 9/25/96), 680 So.2d 1327. In the present case, the trial court awarded attorney fees to Campbell, and the Second Circuit increased that award upon his successful appeal. However, the provisions of the agreement only provide for attorney fees in the event of nonperformance by either party. Because we find that both parties performed under the contract, and that the contract was validly terminated, we reverse the lower courts' award of attorney fees.

CONCLUSION
For the foregoing reasons, we reverse the lower courts' judgment ordering specific performance of the contract by Millennia Group, L.L.C., the McGaha's, and Melton.

DECREE
For the reasons assigned, the judgments of the trial court and appeals court are vacated and set aside. It is now ordered that there be judgment in favor of defendant, Harold Keith Melton, and against the plaintiffs, Edward and Kimberly Campbell. It is further ordered that the reconventional demand by Harold Melton is hereby dismissed. It is further ordered that the Clerk of Court for the 1st Judicial District in Caddo Parish cancel the notice of lis pendens filed on December 18, 1997 under Instrument No. 1584980, in Mortgage Book 2677 at page 198, regarding the subject property.
VACATED; JUDGMENT RENDERED FOR DEFENDANT.
VICTORY and WEIMER, JJ., concur.
CALOGERO, C.J., concurs and assigns reasons.
CALOGERO, C.J., concurring.
I concur in the majority's determination that the "additional provisions clause" was a resolutory condition which was met by Campbell's making a demand for repairs over $2,000. I do not believe, however, as the majority states, that "the trial court was manifestly erroneous in admitting parol evidence regarding Campbell's intent in discussing the repair items." While the contract required any demand for repairs *81 to be made in writing, there is no prohibition in the contract nor in the law prohibiting a court from considering parol evidence relating to those writings.
In my view, the trial court manifestly erred, not by considering parol evidence, but in determining that Campbell did not make a demand for payment. Even considering the parol evidence submitted to the court, the fact that Campbell wrote two letters to Melton concerning repairs, indicating Melton was responsible for them in the amount of $15,000, can leave no other conclusion, but that Campbell made a demand for repairs over $2,000. Therefore, I agree with the majority's conclusion but disagree with their finding that parol evidence was improperly admitted.
NOTES
[*] Retired Justice Walter F. Marcus, assigned as Associate Justice Ad Hoc, sitting for Justice Catherine D. Kimball, recused.
[1] Melton bought the 5900 square foot home, located on seven acres, for $400,000 in 1987. He subsequently spent $225,000 in renovations while living there. The initial listing price for the property was $599,000 when it went on the market in 1996.
[2] Melton maintains that the Campbells withheld service of the petition until after Melton had sold his property to Millenia on December 23, 1997.
[3] On April 28, 2000, the Campbells amended the petition to add Millennia and the McGahas as defendants to the suit.
[4] A notice of lis pendens may be recorded to give notice of the pendency of an action affecting immovable property. La.Code Civ. Proc. art. 3751. The recordation of the notice of lis pendens makes the outcome of the suit of which notice is given binding on third parties. See Ducote v. McCrossen, 95-2072 (La.App. 4 Cir. 5/29/96), 675 So.2d 817.
[5] Art. 2056 provides:

In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.
A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.
[6] While Melton correctly identifies the presence of a condition, he erroneously refers to the condition as a "condition precedent," the common law term equivalent to the suspensive condition in civil law. Rather, the clause imposes a resolutory condition, or condition subsequent, that obligates the parties under the purchase agreement until the uncertain event occurs, i.e., the contract is in force unless a mechanical item repair exceeding to $2,000 is discovered. See Zemurray v. Boe, 235 La. 623, 105 So.2d 243, 249 (1958).
[7] In determining the intent of the Campbell's communications, the trial court also considered letters to the Campbells from Roos, the dual agent in the deal, who stated that she did not consider the Campbells' communication to be a demand. The trial also apparently gave weight to the fact that when the closing attorney sent the purportedly final sales contract, Melton did not respond. The trial court stated that while it acknowledged that the purported sales contract did not conform to the agreement to sell inasmuch as it did not include "as is," a waiver of redhibition, and other defects, Melton nevertheless should have replied to demand conformity.
[8] We also note that the laws of this state regarding contracts to transfer or otherwise affect immovables often require signed writings. See La. Civ.Code art. 1839 (transfer); La. Civ.Code art. 2440 (contract to sell); La. Civ.Code art. 2993 (mandate); see also Di Cristina v. Weiser, 215 La. 1115, 42 So.2d 868, 871 (1949) (holding that extension of time for performance must be in writing); Miller v. Douville, 12 So. 132 (La.1893) (holding that a condition dependent on the will of a party to whom an offer to sell is made should be reduced to writing to recover its binding effect). While we decline to address in this case whether proof of the fulfillment of a condition affecting an immovable should always be confined to writing, we find the parol evidence in this case irrelevant and unnecessary when (1) the contract specified a signed writing regarding objections to the inspections; and (2) Campbell executed a signed writing objecting to mechanical items found during the inspections.