United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 22, 2003**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

_____

m 02-20757

_____

CHEVRON U.S.A., INC.,

Plaintiff-Appellee,

VERSUS

SANTA FE SNYDER CORPORATION, ET AL.,

Defendants,

SANTA FE SNYDER CORPORATION; SAMEDAN OIL CORPORATION;
RANGER OIL COMPANY,

Defendants-Appellants

_____

Appeal from the United States District Court
for the Southern District of Texas
m H-00-CV-847

_____

Before SMITH and BARKSDALE, Circuit Judges, and FITZWATER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:[**]

Defendant Santa Fe Snyder Corporation and others appeal a summary judgment for Chevron U.S.A. entered on the basis that Santa Fe contracted to have Chevron process its entire monthly natural gas production. Although the parties' agreement requires Santa Fe to pay minimum monthly processing fees, it does not require Santa Fe to deliver any or all of its production to Chevron. We reverse and remand.

## I.

Chevron owns and operates a gas processing facility, a well, and a lease, designated South Timbalier Block 177 ("Block 177"), located on a platform off the coast of Louisiana. Santa Fe and others jointly own oil and gas wells and a lease, designated South Timbalier Block 178 ("Block 178"), located on a nearby offshore platform. In 1996, Chevron and Santa Fe entered into an agreement by which Chevron agreed to process Santa Fe's production from Block 178. In March 1998, the parties amended the agreement to accommodate the production from another well owned by Santa Fe, South Timbalier Block 179 ("Block 179").[1]

[*] District Judge of the Northern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4

[1] Block 178 contains two wells (Wells A-1 and A-3), and Block 179 contains one well (Well B-1).

The agreement was terminable by either party on or after October 1, 2001. By way of the March 1998 amendment, Santa Fe reserved the right to terminate the agreement early with respect to Block 179 (but not Block 178) by giving written notice ninety days in advance. In November 1998, Santa Fe invoked this provision by notifying Chevron that it intended to install its own processing facilities. Santa Fe also stated that as soon as its processing facilities were functional, it would process all production from Blocks 178 and 179. For Block 178, Santa Fe stated that it would pay the minimum monthly processing and administrative fees specified in the agreement.

Chevron replied that cessation of production deliveries in advance of the termination date would be viewed as a breach of contract. Specifically, Chevron notified Santa Fe that its offer to pay minimum fees in lieu of fees generated through processing was not acceptable substitute performance. In February 1999, Santa Fe ceased delivery of production to Chevron and began paying the minimum monthly fees.

Chevron sued for, *inter alia*, declaratory relief and breach of contract, contending it is entitled to process Santa Fe's entire production for the full term of the agreement, subject only to its own operational constraints and the February 27, 1999 (ninety days after notice) termination date for Block 179. Defendants counterclaimed, seeking a declaratory judgment that the agreement did not obligate them to deliver any or all of the production from Blocks 178 and 179. The district court granted Chevron's motion for partial summary judgment, finding that "the parties contracted for the delivery and processing of actual production from Santa Fe's wells in Timbalier

2

Blocks 178 and 179."

## II.

We review a summary judgment *de novo*. *King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In the context of contract interpretation, "only when there is a choice of reasonable interpretation of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." *Amoco Prod. Co. v. Tex. Meridian Res. Exploration, Inc.*, 180 F.3d 664, 669 (5th Cir. 1999).

## III.

The dispute centers on whether Santa Fe was required to deliver all production from its Block 178 and 179 wells or whether, instead, it retained the right to process its gas elsewhere so long as it paid the minimum monthly processing and administrative fees. Because the agreement originates from a federal lease on the outer continental shelfSSoff the coast of LouisianaSSthe choice-of-law provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1333(a)(2)(A), 1349(b)(1), apply, so construction of the agreement is governed by Louisiana law to the extent such law is not inconsistent with federal law. *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990).

Under Louisiana law, "[w]hether a contract is ambiguous or not is a question of law." *Lawrence v. Terral Seed, Inc.*, 796 So. 2d 115, 123 (La. App. 2d Cir. 2001) (citation omitted), *writ denied*, 808 So. 2d 341 (La. 2002). If "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046 (West 1987). "The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Campbell v. Melton*, 817 So. 2d 69, 76 (La. 2002) (citations omitted). "The fact that one party may create a dispute about the meaning of a contractual provision does not render the provision ambiguous." *Id.*

Key to the district court's conclusion that Santa Fe was required to deliver all of its production is the agreement's preamble, which sets forth its purpose:

> WHEREAS, Santa Fe desires to produce gas, condensate and water production from the Well (the "Production") through its construction of an eight inch (8") N.D. pipeline from the initial Well, and any subsequent Lease Wells, to that certain Chevron operated "E" platform . . . .

> WHEREAS, Chevron desires to receive the Production at the Chevron Operated Platform, perform certain processing services and redeliver the Production . . . .

The term "production"SSdefined as "gas, condensate and water production from the

Well"SSis used throughout the agreement.[2] Sections one and two state the obligations of each party. In section one, Santa Fe agrees to "deliver the Production at the Connection Point at . . . the Chevron Operated Platform" and "properly treat all of its Production to prevent the entry of any corrosive product(s) or chemicals into Chevron's facilities." Section two obligates Chevron to "receive the Production at the Chevron Operated Platform and perform" certain duties, including the separation, compression, treatment, and redelivery of natural gas.

Section three defines "Processing Fees":

The "Processing Fees" are hereby defined (i) as not less than minimum processing fees of $3,000.00 per calendar month ("Minimum Processing Fees") from initial commencement of Processing until termination of this Agreement, except and excluding any such calendar month during which Chevron is not prepared to receive the Production and perform the Processing and further except and excluding any calendar month lacking at least twenty (20) days of Processing due to force majeure pursuant to Section 21, and (ii) as itemized hereafter . . . .

Section three continues by setting per-unit rates for the separation, compression, and treatment of gas, as well as administrative overhead of $1000. For example, compression fees are set at $0.20 per MCF, and the treatment of oil and condensate is set at $0.50 per barrel. Section six limits Chevron's processing obligation to "volume rates not to exceed 2,500 barrels of condensate per day, 50 MMCF of natural gas per day, and 1000 barrels of produced water per day; provided, however, that Chevron shall not be required to compress gas hereunder in excess of 1 MMCF of natural gas per day."

The district court reasoned that the preamble's definition of "production" "suggests that the agreement contemplates the processing of the actual production from Santa Fe's wells and not simply an option either to process or pay a *de minimus* [*sic*] monthly fee." Although section three does not explicitly provide Santa Fe with an "option" of delivering production or paying a minimum monthly fee, the court interpreted section three as "provid[ing] Chevron a minimal amount of revenue in the event that deliveries of production for a particular month unexpectedly fell below projections."

Given that an unambiguous contract contains terms that are "clear and explicit," LA. CIV. CODE ANN. art. 2046 (West 1987), the agreement did not unambiguously grant Chevron the right to process all of Santa Fe's production. The agreement discusses minimum monthly fees but nowhere requires Santa Fe to deliver any, much less all, of its production to Chevron. The district court focused on the preamble's definition of "production," meant to serve as shorthand for "gas, condensate and water production from the Well," and erroneously interpreted it as creating an exclusivity arrangement.[3] Yet, an

---

[2] In the amended agreement, the parties expanded the definition of "production" to include "the comingled production from South Timbalier 178 and South Timbalier 179."

[3] Generally, a preamble does not create rights beyond those conveyed by the contract's operative terms. *See Grynberg v. F.E.R.C.*, 71 F.3d 413, (continued...)

exclusivity arrangement cannot be created by implication.

In *Pogo Producing Co. v. Sea Robin Pipeline Co.*, 493 So. 2d 909, 914 (La. App. 3d Cir.), *cert. denied*, 497 So. 2d 310 (La. 1986), the court recognized the efficiencies of exclusivity arrangements, or output contracts, but only where mutual consideration or "cause" exists. Exclusivity arrangements benefit sellers of services such as Chevron, because they are assured a constant demand, while buyers of services such as Santa Fe are assured a constant supply. Chevron processed its own natural gas derived from its Block 177 Well and therefore did not look to Santa Fe as an exclusive source of business. Instead, evidence suggests Chevron entered into the agreement to fill excess capacity.

As part of the bargain, Chevron received $4000 in minimum monthly processing fees, while simultaneously imposing a ceiling on the amount of Santa Fe's gas it was willing to process. This suggests a lack of mutuality if the contract is interpreted as an output contract: Why would Santa Fe pay additional consideration to lock itself into an exclusivity arrangement?[4]

In the 1996 agreement, the parties likely contemplated Santa Fe's delivering its entire production to Chevron, though this was never reduced to writing. Perhaps the geographical isolation of the platforms prevented competition, while the prospect of Santa Fe developing its own processing facilities was remote. By the time the agreement was amended, Santa Fe's construction of processing facilities evidently became a possibility, hence the insertion of the ninety day termination clause.

The parties' intentions are irrelevant, however; because the agreement did not state that Santa Fe was required to deliver all or any of its production to Chevron, there is no ambiguity. So long as Santa Fe paid the contractually defined monthly minimum processing and administrative fees, it could not, as a matter of law, have breached the agreement except by failing to pay additional fees incurred as a result of processing actual deliveries or by failing to meet section two's qualitative obligations. As we have already said, quoting *Campbell*, 817 So. 2d at 76, the rules of construction do not authorize us to pervert the words of a contract or to create an

---

[3](...continued) 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, 'cannot create any right beyond those arising from the operative terms of the document.'").

[4] Santa Fe argues that the agreement resembles a "take or pay" contract. Natural gas sales contracts typically contain a take or pay clause that requires the "pipeline-purchaser either to take (and pay for at the maximum lawful price) a specified quantity of natural gas during each contract year or (continued...)

[4](...continued) to make a single annual payment to the producer to the extent that the volumes of gas taken during any contract year fall short of the minimum annual contract quantity." *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1164 (5th Cir. 1988). Louisiana courts have construed take or pay contracts as imposing alternative obligations. *Pogo Producing*, 493 So. 2d at 916. Santa Fe was not required to perform alternative obligations; it was required only to pay a minimum monthly processing and administrative fee, while meeting certain qualitative delivery specifications; it otherwise was free to decide how much of its production to deliver to Chevron for processing.

ambiguity or to make a new contract. Given that the agreement makes no mention of an exclusivity arrangement or a minimum delivery volume, the district court should have granted summary judgment for defendants.

The judgment is REVERSED, and this matter is REMANDED for further appropriate proceedings.