# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 25, 2012

No. 11-31022

Lyle W. Cayce
Clerk

In the Matter of: CAJUN ELECTRIC POWER COOPERATIVE, INCORPORATED,

Debtor

---------------------------------------------------------------------

SOUTHWESTERN ELECTRIC POWER COMPANY (SWEPCO),

Appellant

v.

COMMITTEE OF CERTAIN MEMBERS OF CAJUN ELECTRIC,

Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
(06-CV-236)

Before JOLLY, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:[*]

Southwestern Electric Power Company ("SWEPCO") and the Committee of Certain Members ("CCM") worked together to submit a joint plan of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-31022

reorganization in the Chapter 11 bankruptcy case of Cajun Electric Power Cooperative ("Cajun Electric"). SWEPCO appeals the bankruptcy court's ruling, affirmed by the district court, that it is liable for legal expenses incurred by the CCM during the bankruptcy proceedings. For the following reasons, we affirm in part and reverse in part.

## BACKGROUND

In December 1994, Cajun Electric, a Louisiana electrical cooperative comprised of twelve member cooperatives, filed for bankruptcy protection under Chapter 11. Shortly thereafter, ten of the twelve member cooperatives formed an informal committee known as the CCM for purposes of the bankruptcy case. The CCM worked with SWEPCO to submit a joint plan of reorganization. Under the proposed plan, SWEPCO would acquire Cajun Electric's assets and the CCM members would enter into long-term agreements to purchase electricity from SWEPCO.

In January 1997, during the plan confirmation process, three of the CCM members decided to withdraw from the CCM and support another reorganization plan. The withdrawing members moved the bankruptcy court to disqualify the CCM's counsel based on conflicts of interest and the court granted the members' motion. Soon after, SWEPCO gave the CCM, then comprising seven members, $1 million to help with the additional costs necessary to retain new counsel.

On April 17, 1997, SWEPCO and the CCM signed the Term Sheet of Members and SWEPCO (the "97 Agreement") whereby SWEPCO agreed to reimburse additional expenses incurred by the CCM during the bankruptcy proceedings. Section V of the 97 Agreement provides as follows:

> Cost Reimbursement - SWEPCO and the Members have reached an agreement on certain transitional cost reimbursement provisions as

2

No. 11-31022

set forth in Mr. Gillian's letter to Mr. Kleiman dated January 9, 1997; and this agreement is currently being implemented. SWEPCO will reimburse the Members fifty (50%) of reasonable bankruptcy counsel litigation expenses (expenses of Altheimer, & Gray and Dann, Pecar, Newman & Kleiman) and expert expenses incurred in support of the Joint Plan, on a monthly basis, beginning January 1, 1997. In the event the SWEPCO Plan is confirmed, SWEPCO also agrees to reimburse the cooperatives for reasonable outstanding bankruptcy litigation and expert expenses incurred in support of the Joint Plan up to the total cumulative sum (for all past or future payments) of $5,000,000, which sum may be increased pursuant to mutual agreement.

Section VI of the 97 Agreement further provides:

Further, SWEPCO and the Members shall have no obligation or liability to each other or any other party pursuant to this term sheet or the Joint Plan in the event that i) prior to confirmation of the Joint Plan, the Bankruptcy Court enters a favorable contract order; ii) the Joint Plan is denied confirmation by the Bankruptcy Court; or iii) the Bankruptcy Court confirms another plan.

By February 1999, two of the four proposed reorganization plans had been withdrawn, leaving only the SWEPCO/CCM plan and a plan supported by Cajun Electric's Chapter 11 trustee still in the running for confirmation. On February 11, 1999, the bankruptcy court denied confirmation of both remaining plans, but invited the trustee and the SWEPCO/CCM group to submit revised plans, which they did on April 19, 1999.

On May 14, 1999, SWEPCO and the CCM filed a supplemental disclosure statement pursuant to 11 U.S.C. § 1125(b) providing information about their revised plan. The disclosure statement included a section titled "Reimbursement of Costs and Fees," which purported to describe the "only agreements as to reimbursement of fees and expenses" between SWEPCO and the CCM. The reimbursement agreements in the supplemental disclosure were similar to those

3

No. 11-31022

in the 97 Agreement, but included changes in key language and provisions not present in the 97 Agreement.

The plan confirmation process continued until August 18, 1999, when the district court ordered the parties to appear at the federal courthouse in Baton Rouge, Louisiana, and participate in settlement negotiations. The parties appeared on August 25, 1999, and reached a settlement that same day. Under the settlement agreement, SWEPCO and the CCM would withdraw their plan and the plan supported by Cajun Electric's Chapter 11 trustee (by then known as the "Creditors' Plan") would be confirmed. The settlement agreement also provided for partial repayment of the expenses SWEPCO and the CCM incurred during the bankruptcy proceedings. SWEPCO was to receive a $7.5 million administrative expense claim to be paid by the bankruptcy estate and the CCM was to receive $9 million to be paid by proponents of the winning plan. The settlement agreement made no mention of the reimbursement agreements described in the 97 Agreement or the supplemental disclosure.

The settlement agreement was approved by the district court and was incorporated into the winning plan, which was confirmed by the bankruptcy court on October 14, 1999. On February 20, 2000, the CCM filed an application for $9 million in expense reimbursement. The application was approved and the CCM eventually received the $9 million.[1]

On June 19, 2001, roughly twenty months after the winning plan was confirmed, the CCM filed suit against SWEPCO in Louisiana state court asserting a breach of contract claim (the "fee suit"). The CCM alleged that the 97 Agreement required SWEPCO to repay the CCM for legal expenses incurred during the Cajun Electric bankruptcy case and that SWEPCO had failed to do so. SWEPCO removed the case to the bankruptcy court pursuant to 28 U.S.C.

---

[1] The CCM asserts that it incurred a total of $12.9 million in expenses during the Cajun Electric bankruptcy case.

No. 11-31022

§ 1452 and filed an answer and counterclaim. In its counterclaim, SWEPCO alleged that it was entitled to repayment of the $1 million it gave the CCM under a refund provision set forth in the supplemental disclosure. The parties filed cross motions for summary judgment.

The bankruptcy court granted the CCM's motion for summary judgment, denied SWEPCO's motion for summary judgment, and dismissed SWEPCO's counterclaim. The court ruled that SWEPCO owed the CCM $2,610,778.63 pursuant to the 97 Agreement and entered a judgment for that amount, plus interest, on February 2, 2006.[2] SWEPCO filed a notice of appeal in the district court on February 10, 2006. On September 26, 2011, the district court entered an order affirming the bankruptcy court's judgment for the reasons provided by the bankruptcy court. SWEPCO timely appealed to this court.

## STANDARD OF REVIEW

"This court reviews the bankruptcy court's grant of summary judgment de novo, using the same standard employed by the district court." *Shcolnik v. Rapid Settlements Ltd.* (*In re Shcolnik*), 670 F.3d 624, 627 (5th Cir. 2012). Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* (quoting *Hamilton*, 232 F.3d at 477). When determining whether a fact issue exists, the court views "the facts and the inferences to be drawn

---

[2] The bankruptcy court found that $2,610,778.63 represented 50% of the expenses the CCM incurred while the 97 Agreement was in effect.

5

No. 11-31022

therefrom in the light most favorable to the nonmoving party." *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## DISCUSSION

SWEPCO argues that the CCM's fee suit is barred by res judicata, judicial estoppel, and the limitations period for filing reimbursement claims provided in the bankruptcy court's confirmation order. SWEPCO also argues that the 97 Agreement was superseded by the agreements set forth in the supplemental disclosure, and that those agreements provide no basis for recovery by the CCM. SWEPCO further argues that even if the 97 Agreement is an enforceable contract between the parties, as the CCM contends, the plain language of that agreement makes clear that SWEPCO has no obligation to the CCM.

We agree with the last of SWEPCO's arguments and therefore need not address the others. The CCM's fee suit is premised entirely on the 97 Agreement. Its original state court petition seeks to recover exclusively under the 97 Agreement and its position on appeal is that the 97 Agreement is the controlling agreement between the parties. As SWEPCO points out, Section VI of the 97 Agreement provides as follows:

> Further, SWEPCO and the Members shall have no obligation or liability to each other or any other party pursuant to this term sheet or the Joint Plan in the event that i) prior to confirmation of the Joint Plan, the Bankruptcy Court enters a favorable contract order; ii) the Joint Plan is denied confirmation by the Bankruptcy Court; or iii) the Bankruptcy Court confirms another plan.

SWEPCO contends that under this termination provision, any obligation by SWEPCO to reimburse the CCM expired on February 11, 1999, when the SWEPCO/CCM plan was denied, or October 14, 1999, when the winning plan was confirmed. The CCM concedes that it did not seek any payment under the

No. 11-31022

97 Agreement until after those two occurrences (and it did not file the fee suit until June 2001).

The CCM's only argument in response is that the 97 Agreement's termination provision and its requirement that SWEPCO repay the CCM on a monthly basis, taken together, create an obligation to reimburse the CCM based on a resolutory condition. As defined under Louisiana law, an obligation subject to a resolutory condition is one that "may be immediately enforced but will come to an end when [an] uncertain event occurs." LA. CIV. CODE. ANN. art. 1767 (2012). The CCM argues that while SWEPCO is not required to reimburse the CCM for fees incurred after the bankruptcy court denied the SWEPCO/CCM plan, the denial of the plan "did not relieve SWEPCO of the obligation to reimburse the CCM's expenses incurred before that date."

Under Louisiana law, contracts are interpreted based on "the common intent of the parties with courts giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning." *Campbell v. Melton*, 2001-C-2578, (La. 5/14/02); 817 So. 2d 69, 74. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties." *Id.* at 75; *see also* LA. CIV. CODE. ANN. art. 2046 (2012).

The plain language of the 97 Agreement provides that SWEPCO and the CCM "shall have no obligation or liability to each other" pursuant to the agreement if the joint plan is denied or another plan is confirmed. While the CCM asserts that SWEPCO's reimbursement obligation was one subject to a resolutory condition, and therefore immediately enforceable, it fails to explain, or provide any supporting authority, why that fact would overcome the plain language extinguishing the parties' obligations under the agreement when the joint plan was denied or another plan confirmed. While we agree that SWEPCO's reimbursement obligation was immediately enforceable beginning January 1,

7

No. 11-31022

1997, the CCM, for whatever reason, chose not to seek payment until after the SWEPCO/CCM plan was denied on February 11, 1999, and another plan was confirmed on October 14, 1999. Both of these events were sufficient to extinguish SWEPCO's liability under the plain language of Section VI of the 97 Agreement. It was the CCM's own failure to assert its right to reimbursement which permitted SWEPCO to avoid liability.

SWEPCO also argues that the bankruptcy court erred in dismissing its counterclaim based on the refund provision in the supplemental disclosure. The refund provision, which is not present in the 97 Agreement, provides as follows:

> (viii) To the extent that the CCM, WST or Claiborne receive legal or expert expense reimbursement under another confirmed plan, the CCM, WST and Claiborne agree to refund to SWEPCO any such reimbursement up to the total of any sums received from SWEPCO. In the event another plan is confirmed, the CCM, WST and Claiborne agree to use their best efforts to obtain such legal and expert reimbursement under such other plan.

According to SWEPCO, this refund obligation was triggered when the CCM received $9 million pursuant the 1999 settlement agreement and the CCM must now refund the $1 million payment SWEPCO made to the CCM in 1997. The CCM argues that it has no obligation to refund the $1 million because it never received full repayment of the expenses it incurred during the bankruptcy proceedings. It argues that the term "reimbursement," as used in the refund provision, contemplates having received "a sum of money equal to that expended." The CCM maintains that because it expended $12.9 million during the bankruptcy proceedings and only received $9 million pursuant to the settlement agreement, facts not disputed by SWEPCO, the refund provision was never triggered. The bankruptcy court agreed with the CCM, interpreting the plain language of the refund provision to require repayment to SWEPCO only "in the event the [CCM was] able to obtain full reimbursement elsewhere."

No. 11-31022

We agree with the bankruptcy court. The parties' arguments turn on the meaning of the term "reimbursement" as used in the refund provision. As noted above, Louisiana law requires that words in a contract "be given their generally prevailing meaning." LA. CIV. CODE. ANN. art. 2047 (2012). "Reimbursement" is the noun form of "reimburse," which is defined as "to pay back (an *equivalent* for something taken, lost, or expended)" and "to make restoration or payment *of an equivalent to*." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1914 (2002) (emphasis added). According to these definitions, one has not received a reimbursement unless he has received repayment in an amount equal to that expended. SWEPCO's interpretation essentially rewrites the provision to include the word "partial" before "legal or expense reimbursement." The bankruptcy court correctly dismissed SWEPCO's counterclaim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the bankruptcy court's dismissal of SWEPCO's counterclaim and REVERSE its judgment that the CCM is entitled to recover under the 97 Agreement.